ROBERTS, J.,
for the Court.
SUMMARY OF THE CASE
¶ 1. On July 11, 2002, John and Jane Doe, the parents and next friends of K.D., filed a complaint on K.D.’s behalf.[1] Filed in the Hinds County Circuit Court, K.D. sued a Mississippi corporation called “the Mississippi State Federation of Colored Women’s Club Housing for the Elderly in Clinton, Inc. d/b/a Federation Tower Apartments and Southland Management Corporation” (Federation Tower). K.D. sued Federation Tower under causes of action for negligent security, failure to warn, and for failure to maintain the apartment complex in a reasonably safe condition. Essentially, K.D. claimed that, because of Federation Towers’s negligence, Tony Kelly entered the premises and raped her at least six times.
¶ 2. Federation Tower filed a motion for summary judgment. According to the record before the circuit court, the opposing parties presented two distinctly different versions of events. According to the Does, Kelly took advantage of the lack of security at Federation Tower, entered the premises, lived on the premises as a trespasser, encountered K.D. as she played and otherwise went about the apartments, and raped K.D. Federation Towers presented a much different version of events. According to Federation Towers, K.D. opened the fire doors and let Kelly in so that they could have consensual sex.[2]
*823 ¶ 3. The circuit court granted Federation Tower’s motion for summary judgment and held (1) there was no genuine issue of material fact as to whether Federation Tower had actual or constructive knowledge of Kelly’s violent nature and (2) there was no genuine issue of material fact as to whether Federation Tower had actual or constructive knowledge that a violent atmosphere was present at Federation Tower. Aggrieved, K.D. appeals and raises the following issues:
I. WHETHER THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS.
II. WHETHER [K.D.] PRESENTED A GENUINE ISSUE OF MATERIAL FACT AS TO [FEDERATION TOWER’S] ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF TONY KELLY’S VIOLENT NATURE.
IIL^ WHETHER [K.D.] PRESENTED GENUINE ISSUE OF MATERIAL FACT REGARDING PROOF OF AN ATMOSPHERE OF VIOLENCE ON THE PREMISES.
IV. WHETHER [FEDERATION TOWER’S] FAILURE TO KEEP FIRE EXIT DOORS LOCKED CAUSED [KD.’S] INJURIES IS A QUESTION OF FACT FOR THE JURY.
V. WHETHER [FEDERATION TOWER] PROXIMATELY CAUSED [KD.’S] INJURIES IS A QUESTION OF FACT FOR THE JURY.
VI. WHETHER [THE] TRIAL COURT ERRED IN GRANTING [FEDERATION TOWER’S] MOTION TO STRIKE AFFIDAVITS OF WITNESS AMHURST BROWN.
VII.WHETHER [THE] TRIAL COURT ERRED IN DENYING [KD.’S] MOTION TO STRIKE AFFIDAVIT OF DON BYINGTON.
Finding that the circuit court erred in granting summary judgment, we reverse and remand.
FACTS
¶ 4. During the week, K.D. lived with her mother and stepfather in Jackson, Mississippi. Otherwise, K.D. spent weekends with her father, John Doe. John lived in one of the apartments at Federation Tower, located in Clinton, Mississippi. Federation Tower was an “assisted living” complex. John was approximately fifty years old, had a tenth grade education, was on dialysis treatment after a kidney transplant, and previously had hip replacement surgery, had two heart attacks with subsequent bypass surgery, and had poor eyesight. Apparently, he was a Social Security disability recipient.
¶ 5. During March of 2001, a friend of John’s noticed that K.D., then eleven years old, appeared pregnant. John called KD.’s mother, Jane Doe, and asked if she knew whether K.D. was pregnant. K.D. initially denied that she could have been pregnant. K.D. finally confessed that it was possible that she was pregnant, as she had been raped by a man named Tony Kelly. K.D. explained that Kelly raped her during her visits with her father.
¶ 6. On March 20, 2001, Dr. Louisa Lawson examined K.D. and determined that, at that time, K.D. was five to six months pregnant. Additionally, Robert Mahaffey, an investigator with the Hinds County Sheriffs Department, referred K.D. to the Mississippi Children’s Advocacy Center. On March 26, 2001, K.D. visited the Mis *824 sissippi Children’s Advocacy Center and met with Denease Bishop, a clinical therapist. Bishop and K.D. discussed her encounters with Kelly. On April 5, 2001, K.D. visited the Children’s Advocacy Center again. Again, K.D. met with Bishop. K.D. related at least six incidents that involved sexual activity with Kelly.
¶ 7. Kelly was prosecuted for statutory rape. On May 31, 2001, Kelly filed a petition to plead guilty to statutory rape. The circuit court sentenced Kelly to a twenty year sentence with thirteen years suspended and seven years to serve.[3] At the time of this opinion, Kelly is in prison serving his sentence.
¶ 8. K.D., by and through her parents, sued Federation Towers on July 11, 2002. On November 4, 2002, K.D., her father, and her mother all gave their depositions. In K.D.’s deposition, she discussed the times that Kelly raped her.
¶ 9. K.D. testified that Kelly first raped her during September of 2000. On a weekend visit with her father, K.D. went from his first floor apartment to her father’s friend’s apartment on the third floor. K.D. passed a message from her father and left the third floor. As K.D. went down the stairwell, Tony Kelly appeared from underneath the stairwell and grabbed K.D. K.D. screamed for help. K.D. testified in her deposition that she saw James Gray, the night and weekend manager of Federation Tower, about five to ten feet away. K.D. testified that she called to him and asked him to help her. According to K.D., Gray ignored her cries and walked away. Kelly then dragged K.D. into the stairwell and raped her. Kelly told K.D. that he would harm her father if she told anyone what happened, so she did not report the incident. She went back to her father’s apartment. Her father asked her what was wrong. She replied “nothing” and left the apartment to play with a friend.
¶ 10. K.D. alleged that Kelly raped her a second time during November of 2000. At that time, K.D. played hide-and-seek with a friend. As they played in the hallways and stairwell, Kelly again appeared from underneath the stairwell and raped her. After Kelly released her, she went back to her father’s apartment and took a bath. She did not report the rape because she was afraid.
¶ 11. Approximately a month and a half after the second rape, K.D. walked from her father’s apartment to a friend’s grandmother’s apartment. Again, Kelly appeared from underneath the stairwell and raped K.D. After Kelly raped her, K.D. went back to her father’s apartment and took a bath. She did not report that rape at the time. K.D. alleged that Kelly raped her as many as six times.
¶ 12. On November 26, 2002, Gladys Miller, the manager of Federation Tower, gave her deposition. Miller testified that there was not an atmosphere of violence at Federation Tower. Miller also testified that she had no notice of Kelly’s violent nature. James Gray, the night manager of Federation Tower, gave his deposition the same day as Miller. Gray claimed that he did not witness K.D. call out to him. He testified that he narrowly missed witnessing some variety of a sexual encounter involving K.D. Gray stated that, as he *825 walked down a hallway, he heard someone run away. When he turned the corner, he only saw K.D. Gray claimed that K.D. was adjusting her clothes when he saw her. In particular, Gray claimed K.D. was fastening the straps on her overall shorts. Gray concluded that K.D. had been involved in some type of sexual activity and that her partner ran away when they heard Gray approaching.
¶ 13. On September 2, 2004, Kelly gave a deposition. Kelly claimed that he had consensual sex with K.D. Kelly suggested that K.D. would open a fire door for him to allow him access to the apartments. According to Kelly, he would enter the apartments through KD.’s help and then have consensual sex with K.D. — either in the stairwell or in her father’s apartment.
¶ 14. Amherst Brown, a resident of Federation Tower, submitted two affidavits. The basic conclusion in Brown’s two affidavits was that Kelly trespassed at Federation Tower and that there was an atmosphere of violence and frequent crime at Federation Tower. However, Don By-ington, the Chief of Police for the City of Clinton, submitted an affidavit in which he stated that the area surrounding Federation Tower was a low-crime area.
¶ 15. As mentioned, Federation Tower filed a motion for summary judgment. On October 8, 2004, Federation Towers filed a motion to strike Amherst Brown’s two affidavits. K.D. filed a motion to suppress Don Byington’s affidavit. On November 23, 2004, the circuit court granted Federation Tower’s motion to strike Amherst Brown’s affidavits. However, the circuit court denied K.D.’s motion to suppress Don Byington’s affidavit. That same day, the circuit court entered an order and granted Federation Towers’ motion for summary judgment. The circuit court held that K.D. failed to prove that Federation Towers had actual or constructive knowledge of Kelly’s violent nature and that K.D. failed to prove that Federation Towers had actual or constructive knowledge of an atmosphere of violence at Federation Towers.
¶ 16. As for K.D.’s allegation that James Gray saw Kelly pull K.D. into the stairwell, and that K.D. called out to Gray, the circuit court stated that KD.’s statement of what another person saw is pure speculation. The circuit court also stated that, assuming Gray saw K.D. being dragged into the stairwell, it is undisputed that there is no evidence in the record to suggest Gray knew that Kelly was the person who dragged K.D. into the stairwell.
STANDARD OF REVIEW
¶ 17. This Court conducts a de novo review of orders granting or denying summary judgment. Mantachie Natural Gas v. Mississippi Valley Gas Co., 594 So.2d 1170, 1172 (Miss.1992). According to Rule 56 of the Mississippi Rules of Civil Procedure, a circuit court may grant summary judgment “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” “A fact is material if it ‘tends to resolve any of the issues, properly raised by the parties.’ ” Webb v. Jackson, 583 So.2d 946, 949 (Miss.1991) (quoting Mink v. Andrew Jackson Casualty Ins. Co., 537 So.2d 431, 433 (Miss.1988)).
¶ 18. The moving party bears the burden of showing that no genuine issue of material fact exists. Tucker v. Hinds County, 558 So.2d 869, 872 (Miss.1990). Additionally, the circuit court must view the evidence in the light most favorable to the non-moving party. Russell v. Orr, 700 So.2d 619, 622 (Miss.1997). Furthermore, *826 the circuit court must consider motions for summary judgment with a skeptical eye. Ratliff v. Ratliff 500 So.2d 981, 981 (Miss.1986). It is better for the circuit court to err on the side of denying the motion. Id.
ANALYSIS
I. WHETHER THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS.
¶ 19. “A claim of negligence has four elements: duty, breach, causation, and damages.” Price v. Park Management, Inc., 831 So.2d 550 (¶ 5) (Miss.Ct. App.2002). To prove that the circuit court should not have granted Federation Tower’s motion for summary judgment, K.D. had to demonstrate that a genuine issue of material fact existed regarding the fact that: (a) Federation Towers owed her a duty; (b) Federation Tower breached that duty; (c) damages; and (d) “a causal connection between the breach-and the damages, such that the breach is the proximate cause of [her] injuries.” Crain v. Cleveland Lodge 1532, Order of the Moose, Inc., 641 So.2d 1186, 1189 (Miss.1994) (emphasis in original) (citing Lyle v. Mladinich, 584 So.2d 397, 398 (Miss.1991)).
A. DUTY
¶20. First, we must determine what duty Federation Tower owed K.D. That depends on whether K.D. was a licensee, an invitee, or a trespasser. This question of status can be a jury question, but where the facts are not in dispute, the question of status becomes a question of law. Little v. Bell, 719 So.2d 757 (¶ 17) (Miss.1998). Here, there is no dispute about the facts of the case. K.D. visited her father on weekends in his apartment at Federation Tower.
¶21. “[A]n invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage.” Little v. Bell, 719 So.2d 757 (¶ 15) (Miss.1998) (emphasis in original) (quoting Hoffman v. Planters Gin Co., 358 So.2d 1008, 1011 (Miss.1978)). “A landowner owes an invitee the duty to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not plain and open view.” Little, 719 So.2d at (¶ 16) (citing Caruso v. Picayune Pizza Hut, Inc., 598 So.2d 770, 773 (Miss.1992)).
¶ 22. “A licensee is one who enters upon the property of another for his own convenience, pleasure or benefit pursuant to the license or implied permission of the owner.” Little, 719 So.2d at (¶ 15) (citing Hoffman, 358 So.2d at 1011). “A landowner owes a licensee a duty to refrain from willfully or wantonly injuring him.” Little, 719 So.2d at (¶ 16) (citing Adams v. Fred’s Dollar Store of Batesville, 497 So.2d 1097, 1100 (Miss.1986)). A trespasser, however, is someone who “enters upon another’s premises without license, invitation, or other right.” Little, 719 So.2d at (¶ 15) (citing Hoffman, 358 So.2d at 1011). As with a licensee, “[a] landowner owes a trespasser the duty to refrain from willfully or wantonly injuring him.” Little, 719 So.2d at (¶ 16) (citing Adams, 497 So.2d at 1100).
¶ 23. In Price, this Court stated:
It is well settled that a landlord owes his tenants a duty to keep the premises in a reasonably safe condition, and that this duty extends to protecting tenants from the foreseeable criminal acts of others, (citations omitted). It is also well settled that social guests of the tenant are owed no special duty by the landlord, but merely the duty owed by the landlord to trespassers that the landlord not *827 wantonly or willfully injure the guest, (citations omitted).
Pnce, 831 So.2d at (¶ 6).
¶ 24. So, it would seem that K.D., arguably a social guest of her father, should not be classified as an invitee. However, in Lucas v. Miss. Housing Authority # 8, 441 So.2d 101 (Miss.1983), the Mississippi Supreme Court discussed the status of a six-year-old child who drowned while swimming as an invited guest of an apartment tenant. In determining that the child was an invitee, the supreme court quoted the holding in Turnipseed v. McGee, 236 Miss. 159, 109 So.2d 551 (1959) which stated:
The second, alternative theory of liability upon which plaintiff must rely pertains to a multi-unit apartment building, where the owner leases parts to different tenants, and expressly or impliedly reserves other parts, such as entrances, halls, stairways, porches and walks, for the common use of different tenants. It is the landlord’s duty to exercise reasonable care to keep safe such parts over which he reserves control, and, if he is negligent in this respect, and personal injury results to a tenant or to a person there in the right of the tenant, he is liable in tort.
Lucas, 441 So.2d at 103 (emphasis in original) (citing Turnipseed, 236 Miss. at 167, 109 So.2d at 554).
¶ 25. Here, K.D. visited her father at her father’s apartment. K.D. alleges that Kelly raped her in the stairwell of the apartment building. It is difficult for this Court to conclude that any apartment complex would remain financially viable if, as a condition of its lease, it forbid a tenant from allowing his own child to visit at the apartment. Applying the language of Lucas, citing Tumipseed, K.D. was an invitee. A premises owner owes an invitee a duty to exercise reasonable care to protect an invitee from reasonably foreseeable injury at the hands of another. Crain, 641 So.2d at 1189. That being so, we must determine whether K.D.’s injury, no doubt at the hands of another, was “reasonably foreseeable.”
Was K.D’S injury reasonably foreseeable?
¶26. An act may be considered reasonably foreseeable if the premises owner had cause to anticipate the third party act. Id. “Cause to anticipate” a third party act may arise from (1) actual or constructive knowledge of the third party’s violent nature, or (2) actual or constructive knowledge that an atmosphere of violence existed on the premises. Id. Pertinent factors for consideration are (1) “the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant’s business premises,” and (2) “the frequency of criminal activity on the premises.” Id. at 1189— 90.
1. Actual or constructive knowledge of Kelly’s violent nature.
¶ 27. K.D. argues that Federation Tower had actual or constructive knowledge of Kelly’s violent nature because the first time Kelly raped K.D., James Gray, the night manager at Federation Tower, saw Kelly grab K.D. before he raped her. K.D. claimed that Kelly appeared from underneath a stairwell and grabbed her. K.D. also claimed that she saw Gray five to ten feet away, so she called out to Gray for help. K.D. alleged that Gray saw her struggle and heard her cry out to him, but ignored her plea for help.
¶ 28. In his deposition, Gray stated that KD.’s allegation was untrue. According to Gray, he did not see Kelly grab K.D. and he did not hear K.D. call out to him. Gray testified that he encountered K.D.- on *828 the stairwell, but he disputed K.D.’s allegation that K.D. called out to him. Gray claimed that he nearly witnessed some variety of consensual sexual behavior. Gray said he told K.D.’s father that K.D. “was having sex up there with somebody ... on the staircase.” Gray stated that he told Gladys Miller, the apartment manager, about the incident.
¶ 29. Clearly, K.D. swears to one version of events, while Gray swears to another. Applying our standard of review, we must view the evidence in the light most favorable to K.D. Russell v. Orr, 700 So.2d 619, 622 (Miss.1997). The circuit court held that “it is undisputed that there is no evidence in the record to suggest that James Gray knew that the person who dragged [K.D.] into the stairwell was Tony Kelly.” However, viewing the evidence in KD.’s favor, Gray would have had actual notice of Kelly’s violent nature when he saw Kelly grab K.D. Assuming, for the sake of argument, that Federation Tower could not have had actual or constructive knowledge of Kelly’s violent nature prior to the first occasion on which Kelly raped K.D., Federation Tower would have had actual or constructive knowledge of Kelly’s violent nature when Gray saw Kelly drag away a child as she screamed for help. As K.D. claimed Kelly raped her a total of six times, that actual or constructive knowledge would apply to the five subsequent rapes. Because it is better to err on the side of denying summary judgment, we disagree with the circuit court. See Ratliff, 500 So.2d at 981.
2. Actual or constructive knowledge of the existence of an atmosphere of violence.
¶30. Assuming, for the sake of argument, that there is no genuine issue of material fact as to whether Federation Tower had actual or constructive knowledge of Kelly’s violent nature, there is a genuine issue of material fact as to whether Federation Tower had actual or constructive knowledge of the existence of an atmosphere of violence surrounding the premises.
¶ 31. K.D. claims that Federation Tower had actual or constructive knowledge that an atmosphere of violence existed at the apartments. When determining whether a defendant had actual or constructive knowledge that an atmosphere of violence existed, pertinent factors for consideration are (1) “the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant’s business premises,” and (2) “the frequency of criminal activity on the premises.” Crain, 641 So.2d at 1189-90.
¶ 32. When the circuit court granted summary judgment, the circuit court’s order stated:
Like the plaintiff in Crain, the plaintiffs in the case at bar failed to come forward with proof that an “atmosphere of violence” existed at the Federation Tower Apartment Complex during the time period of the alleged rapes in question, which occurred between September of 2000 and February of 2001. This Court takes notice of the fact that there is far less in the way of police reports or incidents of crime occurring at the Federation Tower Apartment Complex and the surrounding area than there was in the Crain case. Though the plaintiffs in the case at bar allege that during the period of September 2000 through February 2001, Federation Tower was experiencing a problem with trespassers, drug dealers, car break-ins, vandalism and other general crimes, the evidence in the record before the Court does not bear this out. It is an undisputed fact that the plaintiffs’ statistics show that only a small number of incidents occurred at *829 the complex from 1994 to 1997, and show no incidents of crime occurring for the years 1998, 1999, 2000 or 2001. In the case at bar, reports of a few crimes from 1994 to 1997 and no crimes during the relevant time period of the plaintiffs rapes, which was between September 2000 and February 2001, cannot be deemed to have put the defendants on notice of the likelihood of rapes being committed by Tony Kelly against the minor plaintiff. It is undisputed that there is no evidence in the record before the Court of prior similar incidents occurring at the apartment complex or any violent crimes at the apartment complex, for that matter, that would have put the defendants on notice and thus given the defendants a reason to foresee the rapes in question. On this point, reasonable minds cannot differ.
¶ 33. In Crain, the supreme court found “that in fifty-five of the sixty months prior to the attack on [the plaintiff] there were numerous commercial burglaries and reports of larceny in the vicinity of the [premises], but there were only eleven assaults, robberies and other violent crimes in that five year period.” Id. at 1192. Accordingly, the supreme court found the attack on the plaintiff in Crain was not foreseeable. Id. We discuss this for comparative purposes only — not because it presents some bright-line test for foreseeability as it applies to the overall pattern of criminal activity in the vicinity of specific premises.
¶ 34. At KD.’s request, John Tisdale, an expert in the field of law enforcement and premises security, prepared a report. In Mr. Tisdale’s report, he detailed that the Federation Tower office was vandalized and burglarized on February 25, 1996. Further, that a television was stolen from the apartment building’s first floor gathering hall and, on August 22, 1996, a strong-arm robbery occurred.
¶ 35. In July of 1994, Federation Tower hired a security guard through Capital Security. Federation Tower decided to cancel the security patrol in 1998, due to budget concerns. Troy Holcomb was a security guard for Federation Tower during that time period. Holcomb gave a deposition and corroborated Mr. Tisdale’s report when he testified that Gladys Miller hired a security guard after someone broke into her office at the apartments. Holcomb also testified that “there were several times where I’ve had — called the police and had to have trespassers removed.”
¶ 36. In his deposition, Holcomb stated that he kept consistent reports. Holcomb kept copies of some of his reports. Those reports are among the record. Additionally, K.D. presented the Clinton Police Department’s records of calls for service to the property and the area around Federation Towers. Holcomb’s documents and the Clinton Police records show that incidents of strong arm robbery, assault, trespassing, drug related crime, burglary, grand larceny, auto theft, as well as incidents of public drunkenness and suspicious persons.
¶ 37. K.D. presented copies of reports prepared by the Clinton Police Department. According to those reports, the following occurred at Federation Tower: (a) on May 25, 1995, Holcomb called the Clinton Police Department and reported that he heard four shots fired from nearby; (b) on February 18, 1996, a tenant reported that her car was stolen; (c) on February 25, 1996, James Gray called the police and reported that someone broke into the office at Federation Tower; (d) on May 6, 1996, Holcomb called the police and reported that someone broke into a car parked at the apartments and stole a pistol *830 and a cell phone; (e) on May 9, 1996, James Gray called the police and reported that someone stole a television from the apartment community room; (f) on June 9, 1996, someone called the police and reported that security needed assistance removing three intoxicated people from the premises; (g) on July 15, 1996, a tenant called the police and reported an incident of theft; (h) on July 17, 1996, a tenant reported a car theft; (i) on August 14, 1996, a tenant reported another car theft; (j) on August 22, 1996, a tenant called the police and reported that someone grabbed her, threw her to the ground, struck her, choked her, and robbed her; (k) on December 15, 1996, James Gray called the police and reported a public drunk; (J,) on June 6, 1997, Holcomb reported a suspicious person who continually tried to enter the apartments at 4:05 a.m.; (m) on July 14,1997, Holcomb reported a public drunk; (n) on August 24, 1997, Holcomb reported an attempted car burglary during which someone broke a window and attempted to steal a car, (o) On September 26, 1997, Holcomb reported an incident in which someone broke into the office at Federation Tower and stole a cell phone, and (p) on October 7, 1997, Holcomb called the police and reported multiple trespassers. Curiously, there are no police reports in the record regarding Federation Tower between 1997 and 2002, but there are a multitude of reports of assault, theft, and trespassing in the vicinity of Federation Tower after 2002 — including incidents of child abuse, kidnapping, and sexual battery.
¶38. Gladys Miller gave a deposition and stated that there was not an atmosphere of violence at Federation Tower. James Gray also gave a deposition and testified similarly. However, K.D. presented a memorandum prepared by Miller in which Miller recognized that trespassers were able to gain access to the building through the fire exit doors, which were prevented from locking properly when tenants obstructed the latches. Considering the overall pattern of criminal activity in the vicinity of Federation Tower and the frequency of that criminal activity, we are of the opinion that a genuine issue of material fact exists as to whether Federation Tower had actual or constructive notice of an atmosphere of violence on or around their property.
B. BREACH
¶ 39. The circuit court based its decision on a lack of genuine issue of material fact regarding Federation Tower’s duty in light of the presence of third party criminal acts. Accordingly, the circuit court only addressed the issue of breach with the following language:
Even if this Court were to take the plaintiffs’ side regarding foreseeability and notice, plaintiffs’ claim would still fail, as a matter of law, because the plaintiffs must make a showing of proximate cause between the alleged breaches of the defendants and the resulting harm to her. This the plaintiffs failed to do. This Court finds, as a matter of law, that there is no evidence of a breach of any duty owed on the part of the defendants which proximately caused or contributed to the rapes in question. See Price v. Park Management, 831 So.2d 550 (Miss.App.2002.)[sic].
¶ 40. We disagree. K.D. presented evidence in the form of her deposition testimony that Federation Tower (a) had actual or constructive notice of Kelly’s violent nature, yet did nothing to prevent Kelly from raping her, and (b) had actual or constructive notice of an atmosphere of violence in the vicinity of Federation Tower while discontinuing security services and neglecting to take other preventative measures to mitigate those risks.
*831 C. CAUSATION
¶ 41. Not only must KD. demonstrate duty and breach, K.D. must demonstrate that a genuine issue of material fact exists as to whether there was “a causal connection between the breach and the damages, such that the breach is the proximate cause of [her] injuries.” Crain, 641 So.2d at 1189. “Proximate cause arises when the omission of a duty contributes to cause an injury.” Id. at 1192.
The circuit court briefly mentioned the element of causation in its order:
The plaintiffs contend that proximate cause is a jury question. However, that is certainly not always the case. The Mississippi Supreme Court has affirmed the grant of summary judgments and directed verdicts in favor of defendants on appeal and has not hesitated to reverse and render cases in favor of defendants on appeal on the issue of proximate causation and the doctrine of independent, intervening causes, (citations omitted).
¶ 42. The circuit court did not actually find that no genuine issue of material fact existed as to the element of causation, but that is to be implied from the circuit court’s language. In light of our resolution of the issues above, there are issues of material fact regarding the proximate causation element. See Lyle, 584 So.2d at 400. As for damages, that element played no part in the circuit court’s decision to grant summary judgment. Accordingly, we remand this matter to the circuit court for a trial on the merits.
¶ 43. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED AND REMANDED TO THE CIRCUIT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES AND ISHEE, CONCUR. IRVING, J., CONCURS IN RESULT ONLY.

. We use the fictitious initials "K.D.” to protect the child's identity.

. K.D. was eleven years old at the time. In discussing the facts of this case and the positions of the parties, we acknowledge Section 97-3-65 of the Mississippi Code Annotated (Rev.2000), which sets forth the elements of the crime of statutory rape. Consent or mistake of age are not defenses to the crime when the child is younger than fourteen years *823 of age. Miss.Code Ann. § 97-3-65(l)(c) (Rev. 2000). Our discussion in no way effects the validity of that statute.

. Statutory rape is a violation of Section 97-3-65 (Rev.2004) of the Mississippi Code. Pursuant to Section 97-3-65(2)(c) the sentencing guidelines for a violation is imprisonment for a minimum of twenty years and a maximum of life imprisonment. According to Section 47-7-33(1) of the Mississippi Code Annotated (Rev.2004), the circuit court has no authority to suspend a portion of a sentence when the maximum punishment is life imprisonment. Section 47-7-33(1) was in effect at the time Kelly pled guilty.