957 So.2d 390 (2007)
Bernice DAVIS, individually and on behalf of the Wrongful Death Beneficiaries of Lucius Davis, Deceased, Appellant
v.
CHRISTIAN BROTHERHOOD HOMES OF JACKSON, MISSISSIPPI, INC., William E. McKnight and Southland Management Corporation, Appellees.
No. 2005-CA-01743-COA.
Court of Appeals of Mississippi.
May 8, 2007.
*394 Jennifer Paige Wilkins, Barry W. Howard, Robert Farley Wilkins, attorneys for appellant.
Walker Reece Gibson, Michael Wayne Baxter, Ridgeland, attorneys for appellees.
Before LEE, P.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. This wrongful death action brought under a theory of premises liability arose from circumstances surrounding the shooting death of Lucius Davis at Christian Brotherhood Apartments ("CBA") in Jackson, Mississippi on February 4, 2003. Lucius's mother, Bernice Davis, initiated this action in her individual capacity and as representative of the wrongful death beneficiaries of Lucius. Davis now appeals to this Court from the Circuit Court of Hinds County's grant of summary judgment in favor of Appellees Christian Brotherhood Homes of Jackson, Mississippi, Inc.("CBH"), William E. McKnight, and Southland Management Corporation ("Southland").[1] Davis asserts that summary judgment was improper because there were genuine issues of material fact with regard to (1) the duty owed to Lucius Davis, (2) Christian Brotherhood's knowledge of an atmosphere of violence on the premises of CBA or of the violent nature of Troy Younger, (3) whether a lack of security measures at CBA constituted a breach of the duty Christian Brotherhood owed to Lucius, and (4) whether the lack of security at CBA was the proximate cause of Lucius's death. Finding no reversible error, we affirm the summary judgment of the circuit court.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. In the early morning hours of February 4, 2003, shortly after midnight, Troy Younger shot Lucius Davis multiple times in the parking lot of CBA after an argument over a burglary committed earlier that evening. Lucius was transported to the University Medical Center where he was pronounced dead several hours later. *395 Bernice Davis, individually and on behalf of Lucius Davis's wrongful death beneficiaries, filed a complaint on May 21, 2004,[2] asserting claims based on the negligence of Christian Brotherhood for failing to warn of or remedy the dangerous conditions created by the criminal activity which Davis alleges was prominent on the premises of CBA. Davis alleges that Christian Brotherhood negligently failed to employ security guards or take any other security measures and that this lack of security on the premises of CBA proximately caused Lucius's death.
¶ 3. Lucius was thirty years old at the time of his death. Although it is not clear from the record the extent of his learning disability, the record indicates that Lucius was not employed at the time of his death and was receiving disability and Social Security benefits of approximately $500 per month. Lucius was never a tenant at CBA, but for over a year prior to his death, he resided with his mother, Bernice Davis, and his sister, Felicia Allen, who were both tenants at CBA.
¶ 4. The record does not paint a complete picture of the day's events preceding Lucius's death. Christian Brotherhood asserts that Younger and Lucius had been drinking and socializing peacefully several hours prior to the shooting, and that Lucius and Younger had both participated in the burglary of CBA resident Robert Douglas Ricks's apartment. Ricks testified in a deposition conducted on March 15, 2005, that he had seen Lucius, Younger, and other individuals "hanging out" in the CBA parking lot drinking alcohol several hours prior to the shooting. Ricks also testified that after arriving at his apartment later that evening in response to a neighbor's report that his apartment had been burglarized, he witnessed Younger and other individuals running from the parking lot when they saw Ricks drive up. Lucius, however, did not flee. According to Ricks, Lucius approached him and Ricks told Lucius that "I just want my stuff back." Ricks testified that Lucius then walked out of his apartment and returned a few minutes later with some of the stolen items, and said, "I'm sorry."
¶ 5. Davis refutes that Lucius was involved in the burglary of Ricks's apartment, pointing to the fact that the police burglary report, completed the night of the burglary, states that there was "no suspect information" given to police by Ricks. Davis also points to the deposition testimony of Kelonzo McElroy, whose deposition testimony is the only eyewitness account of the shooting which appears in the record. Kelonzo testified that, just prior to the shooting, he and Marvin Warren were sitting alone in Marvin's car when Lucius approached the vehicle and asked for a ride to a store to buy additional beer. Marvin told Lucius that he could not leave because he had no driver's license and the police were there investigating the burglary of Ricks's apartment. Lucius agreed to wait, and apparently got into the back seat of Marvin's car. Kelonzo testified further as follows:
We sat around, and then [Younger] came walking from around the other way, . . . and want to argue with [Lucius]. They were arguing, but Lucius let him in the car on the backseat. They was on the backseat together arguing about who broke in the house and who stole the 21-inch TV, this and that. So Lucius, he like, Man, you know I ain't do it. I ain't do it. Y'all try to sell me a TV. He saying the other guy did it. *396 [Younger] did it. And the way it looked like, Lucius don't bother nobody.
¶ 6. Although there is some dispute as to why the shooting occurred, it is not disputed that the shooting took place on the premises of CBA, and that at the time of the shooting, there were no security guards or any other security measures in place to restrict access to CBA's premises. CBA is a low-income apartment complex located in Jackson, Mississippi. At the time of the shooting incident at issue, CBA participated in a rent subsidy program administered by the Department of Housing and Urban Development ("HUD") for low-income families, and was owned by CBH. CBH was formed as a non-profit corporation by two religious organizations, apparently for the express purpose of providing affordable housing to low and moderate income families.[3]
¶ 7. Southland managed CBA in exchange for a percentage of the rent collected from the tenants. In effect, Southland oversaw the daily operations of CBA and made decisions regarding the maintenance and safety of the facilities, collection of rents, and hiring of on-site managerial, administrative, and maintenance personnel. Ultimately, Southland had the authority to make all managerial decisions affecting CBA, including whether to provide on-site uniformed security guards, or whether to incorporate any other type of security measures on the premises. This authority was regulated only by the routine inspections and restrictions enforced by HUD and by yearly meetings with representatives of CBH, including Reverend William E. McKnight.[4]
¶ 8. From approximately 1996 through September, 2001, Southland employed Cooper Security to provide uniformed security guards at CBA. In explaining why Southland discontinued Cooper's services after this date, Rick Green, one of Southland's vice presidents who was responsible for CBA, stated that "we had not had any problems for a very long time," and the money that had been spent on security was needed to provide physical maintenance for the property. A letter dated September 10, 2001, was sent to Cooper Security by Lamar Miller, CBA manager, stating that Christian Brotherhood could no longer afford Cooper's services. Contrary to what was reflected in the letter from Miller and in contrast to the deposition testimony of Rick Green as to why Cooper Security was terminated, Yolanda Howard, Miller's secretary, testified in her deposition that the real reason Cooper Security was terminated was because the security guards were not "doing their jobs." According to Howard, Cooper's security guards were not patrolling as they were supposed to and at times did not show up for work at all. Howard testified that Miller's letter was written so that Cooper Security would have a good reference from Christian Brotherhood. In any event, Green asserted that security was no longer necessary at CBA for the safety of the tenants.
¶ 9. Davis disputes Southland's assertion that security was no longer needed at CBA, pointing to numerous instances of criminal activity that occurred both before and after the services of Cooper Security were discontinued at CBA. Davis cites *397 Jackson Police Department ("JPD") crime statistics for the precinct and beat encompassing CBA, a log of criminal activity at CBA reported to JPD from January 1, 2000, through the time of Lucius's shooting death, as well as personal accounts of shootings and other criminal activity as reflected in the deposition testimony of tenants and employees at CBA.[5] Davis contends that this evidence of criminal activity dictated that security guards and other security measures were needed at CBA, and she also asserts that the number and frequency of such activity in and around the premises of CBA made Lucius's shooting death reasonably foreseeable.
¶ 10. Christian Brotherhood subsequently filed a motion for summary judgment, asserting it owed no duty to Lucius to protect him from criminal activity because of his status as a licensee and because the shooting was not reasonably foreseeable. Christian Brotherhood also asserted that any alleged breach was not the proximate cause of Lucius's death. In rendering his bench ruling on Christian Brotherhood's motion for summary judgment, the trial court judge did not rule on all of the issues presented by the parties. As to the issue of whether or not the shooting was foreseeable in light of the evidence of criminal activity on and around CBA's premises, the trial court stated that "I really don't need any convincing that there is an issue of foreseeability." Nevertheless, the trial court ultimately granted Christian Brotherhood's motion for summary judgment based on the court's conclusion that "assuming all of the facts proffered by [Davis] are true, you could have had a policeman or a security guard at every corner in the complex, and it wouldn't have prevented what happened." Accordingly, the trial court made an affirmative ruling only on the issue of proximate cause, finding that there was no genuine issue of material fact as to this negligence element. Judgment was entered to this effect on August 11, 2005. Davis promptly filed her notice of appeal on August 19, 2005. Finding no reversible error by the trial court, we affirm.

STANDARD OF REVIEW
¶ 11. Upon review of a trial court's grant of summary judgment, this Court employs a de novo standard of review. Stallworth v. Sanford, 921 So.2d 340, 341(¶ 5) (Miss.2006) (citing Davis v. Hoss, 869 So.2d 397, 401 (Miss.2004)). This standard dictates that we examine de novo "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which were properly before the trial court to determine whether there is a genuine issue as to any material fact which would preclude judgment as a matter of law. M.R.C.P. 56(c). The evidence so examined must be viewed in a light most favorable to the non-moving party. Busby v. Mazzeo, 929 So.2d 369, 372(¶ 8) (Miss.Ct.App.2006).
¶ 12. "A material fact is one which resolves any `of the issues, properly raised by the parties.'" Strantz ex rel. Minga v. Pinion, 652 So.2d 738, 741 (Miss.1995) (quoting Stegall v. WTWV, Inc., 609 So.2d 348, 351 (Miss.1992)). Taking into account the substantive standard of proof of the underlying claim, summary judgment is improper where "reasonable minds in a jury could differ on such an issue." Id. "Even without an issue of material fact present, the trial court should deny summary judgment where full presentation of the evidence would `result in a triable issue.'" *398 Id. (citing Great Southern Nat'l Bank v. Minter, 590 So.2d 129, 135 (Miss. 1991)). "A mere scintilla of evidence" for the non-moving party, however, is insufficient to withstand a summary judgment motion. Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
¶ 13. Our task in the case sub judice is to apply the preceding standard to each element of negligence, as a plaintiff is required to prove each element by a preponderance of the evidence. May v. V.F.W. Post # 2539, 577 So.2d 372, 375 (Miss. 1991). If there is no genuine issue of material fact with respect to any element, then summary judgment was appropriate in the instant case.

ANALYSIS
¶ 14. As a preliminary matter, we will address two issues raised by the parties to this appeal. First, Davis contends that Troy Younger's refusal to answer questions during Davis's attempt to depose Younger gives rise to an adverse inference against Christian Brotherhood. Davis cites no authority to support her argument. It is not disputed that Younger was not an agent, employee, or otherwise subject to the direction or control of Christian Brotherhood. Accordingly, we cannot construe Younger's decision to invoke his Fifth Amendment right against self-incrimination as giving rise to an adverse inference against Christian Brotherhood.
¶ 15. Second, Davis included excerpts from deposition testimony in her "Record Excerpts" which are not included in the official record submitted to this Court, and which do not appear to have been before the trial court below. As an appellate Court, we may not consider information outside the record. Hardy v. Brock, 826 So.2d 71, 76(¶ 26) (Miss.2002) (citing Dew v. Langford, 666 So.2d 739, 746 (Miss.1995)). If either party believed that the record does not accurately reflect what occurred in the trial court, the proper procedure for correcting or modifying the record is outlined in the Mississippi Rules of Appellate Procedure 10(e). We turn now to the merits of this appeal, considering only such information as is contained in the official record.
¶ 16. "The elements of a negligence action are well-settled in Mississippi. A plaintiff in a negligence suit must prove by a preponderance of the evidence (1) duty, (2) breach of duty, (3) causation, and (4) injury." Patterson v. Liberty Assocs., L.P., 910 So.2d 1014, 1019(¶ 14) (Miss. 2004) (citing Miss. Dep't of Transp. v. Cargile, 847 So.2d 258, 262 (Miss.2003)). At the hearing on Christian Brotherhood's motion for summary judgment, the trial judge focused on the issue of proximate causation, and the trial court's ultimate decision granting summary judgment was based only on a lack of proximate cause. Although the trial court did not make an affirmative finding with respect to each element of negligence, and although Davis does not posit the issues as such, we note that summary judgement was proper unless a genuine issue of material fact existed with respect to each contested element of negligence.[6] Therefore, our de novo review will involve a discussion of each of the elements of negligence which are contested *399 on appeal. However, as we are affirming based only on the element of proximate causation, which was also the basis for the trial court's decision in this case, we include discussion of each element of negligence in the interests of completeness. We note that this approach will not only address the trial court's basis for summary judgment, but will also address all of the issues raised by each party to this appeal. Accordingly, we frame the issues for our review as follows: (1) whether Christian Brotherhood owed Lucius Davis a duty to protect him from the criminal acts of third parties, (2) whether Christian Brotherhood breached that duty by failing to provide security guards or by failing to implement other security measures, and (3) whether the alleged breach was the proximate cause of Lucius Davis's injuries. We will not address the damages element of negligence, as there is no dispute that Lucius's death resulted in at least some damages.
A. WHETHER CHRISTIAN BROTHERHOOD OWED LUCIUS DAVIS A DUTY TO PROTECT AGAINST THIRD PARTY CRIMINAL ACTIVITY
1. Whether Lucius was an invitee, licensee, or trespasser
¶ 17. The first step in determining the duty owed to an individual injured on the premises of another is to determine whether that individual, at the time of injury, was an invitee, licensee, or a trespasser. According to our supreme court:
an invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage . . . [.] A licensee is one who enters upon the property of another for his own convenience, pleasure, or benefit pursuant to the license or implied permission of the owner whereas a trespasser is one who enters upon another's premises without license, invitation, or other right.
Corley v. Evans, 835 So.2d 30, 37(¶ 21) (Miss.2003) (quoting Hoffman v. Planters Gin Co. 358 So.2d 1008, 1011 (Miss.1978)).
¶ 18. Although not the insurer of an invitee's safety, a premises owner does have the duty "to keep the premises reasonably safe, and when not reasonably safe, to warn only where there is hidden danger or peril that is not in plain and open view." Id. at 37-38(¶ 22) (quoting Caruso v. Picayune Pizza Hut, Inc., 598 So.2d 770, 773 (Miss.1992)). "[T]his duty extends to protecting tenants from the foreseeable criminal acts of others." Price v. Park Mgmt., 831 So.2d 550, 551(¶ 6) (Miss.Ct.App.2002) (citing Tharp v. Bunge Corp., 641 So.2d 20, 25 (Miss.1994); O'Cain v. Harvey Freeman & Sons, Inc., 603 So.2d 824, 830 (Miss.1991)). The duty owed to licensees and trespassers, however, is merely "to refrain from willfully or wantonly injuring him." Little v. Bell, 719 So.2d 757, 760(¶ 16) (Miss.1998) (citing Adams v. Fred's Dollar Store of Batesville, 497 So.2d 1097, 1100 (Miss.1986)). A premises owner has no duty to protect licensees or trespassers from conditions of the premises, and hence, may not be held liable for injuries which are the result of passive negligence, which is defined as "the failure to do something that should have been done." Titus v. Williams, 844 So.2d 459, 466(¶ 27) (Miss.2003) (quoting Black's Law Dictionary 718 (6th ed.1991)). Accordingly, if Lucius was an invitee as asserted by Davis, then Christian Brotherhood had a duty to protect him from the foreseeable criminal acts of others. If, on the other hand, Lucius was a licensee, as Christian Brotherhood argues on appeal, then Christian Brotherhood had no duty to *400 protect him from the criminal acts of third parties, including Troy Younger.
¶ 19. In the instant case, Christian Brotherhood admitted, in response to Davis's third set of requests for admissions, that Lucius Davis was an invitee "based on present information and belief." Subsequent to this admission, however, Christian Brotherhood filed a motion pursuant to Mississippi Rules of Civil Procedure 36(b) to withdraw and amend its response to reflect Christian Brotherhood's denial of the requested admission. The trial court never ruled on Christian Brotherhood's motion before entering summary judgment in favor of Christian Brotherhood, and the language of Rule 36(b) states that any matter admitted "is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Even assuming, without deciding, that Christian Brotherhood was entitled to withdraw and/or amend its admission that Lucius was an invitee, we nevertheless find that Lucius was an invitee on the premises of CBA.
¶ 20. In Doe v. Mississippi State Fed'n of Colored Women's Club Housing for the Elderly in Clinton, Inc., 941 So.2d 820 (Miss.Ct.App.2006), this Court considered whether a minor was an invitee by virtue of her occasional weekend visits with her father, who was a tenant at the subject apartment complex. There, we held that the minor, who had been raped in the stairwell of the apartment complex, was an invitee. Id. at 827(¶ 25). In so holding, we relied on a Mississippi Supreme Court opinion finding the status of a six-year-old who drowned while swimming as an invited guest of a tenant to be that of invitee. Id. at 827(¶ 24) (citing Lucas v. Miss. Housing Authority # 8, 441 So.2d 101 (Miss.1983)). The Lucas court, in turn, quoted the following language from Turnipseed v. McGee, 236 Miss. 159, 109 So.2d 551 (1959) in support of its holding:
The second, alternative theory of liability upon which plaintiff must rely pertains to a multi-unit apartment building, where the owner leases parts to different tenants, and expressly or impliedly reserves other parts, such as entrances, halls, stairways, porches and walks, for the common use of different tenants. It is the landlord's duty to exercise reasonable care to keep safe such parts over which he reserves control, and, if he is negligent in this respect, and personal injury results to a tenant or to a person there in the right of the tenant, he is liable in tort.
Lucas, 441 So.2d at 103 (quoting Turnipseed, 236 Miss. at 167, 109 So.2d at 554).
¶ 21. In the instant case, Lucius was not just a weekend guest of his tenant mother, Bernice Davis, as was the case in Doe, nor was he the swimming guest of a tenant, as was found sufficient for invitee status in Lucas. There is no dispute that Lucius had been residing at CBA for over a year with his mother, Bernice, and sister, Felicia Allen, who were both tenants of CBA. Christian Brotherhood contends that, since Lucius was not listed on the leases of either Felicia or Bernice, he was, at most, a licensee on the premises of CBA. However, considering our recent holding in Doe, and in light of our supreme court's holdings in Lucas and Turnipseed, we are not convinced that the absence of Lucius's name on a CBA lease is dispositive of the issue. As compared to the circumstances which we concluded gave rise to invitee status in Doe, we find the permanent nature of Lucius's residence at CBA prior to his death even more indicative of invitee status than the circumstances found in the authorities which we relied upon in deciding Doe. Accordingly, Christian Brotherhood owed Lucius the *401 "duty to exercise reasonable care to protect [him] from reasonably foreseeable injury at the hands of another." Doe, 941 So.2d at 827(¶ 25) (citing Crain v. Cleveland Lodge 1532, Order of the Moose, Inc., 641 So.2d 1186, 1189 (Miss.1994)). Our task now is to determine whether the shooting death of Lucius Davis on the premises of CBA was "reasonably foreseeable."
2. Whether Lucius's shooting death on CBA's premises was reasonably foreseeable
¶ 22. As we explained in Doe, the criminal acts of a third party may be deemed reasonably foreseeable if the premises owner had cause to anticipate such acts. Id. at 827(¶ 26) (citing Crain, 641 So.2d at 1189). "Cause to anticipate" may be imputed to the premises owner by virtue of his "(1) actual or constructive knowledge of the third party's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence existed on the premises." Id. "[T]he overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises, as well as the frequency of criminal activity on the premises" are both relevant factors in determining whether an "atmosphere of violence" exists on the premises. Crain, 641 So.2d at 1189-90.
¶ 23. We do not find any evidence contained in the record which would suggest that Christian Brotherhood was aware of Troy Younger's violent nature. Davis points to the deposition testimony of Lamar Miller, manager at CBA, where he admitted that "he had heard" about Younger's criminal history and admitted knowing that Younger had been in jail. We do not necessarily equate knowledge of a person's criminal history with knowledge of a person's "violent nature." In fact, as far as the record reflects, it is just as plausible that Younger's prior incarceration, of which Miller was admittedly aware, was due to a nonviolent crime. There is simply nothing in the record to indicate that Christian Brotherhood knew or should have known that Younger had a violent nature which posed a threat to the tenants at CBA.
¶ 24. We do find, however, a genuine dispute as to whether an atmosphere of violence existed on the premises of CBA, and with respect to whether Christian Brotherhood had actual or constructive knowledge of an atmosphere of violence. Davis presented the following deposition testimony, which we paraphrase, to support her argument that an atmosphere of violence existed at CBA:
Bernice Davis described several specific incidents which she personally witnessed at CBA. Included in her testimony were several accounts of shootings and gunfire at CBA, one of which resulted in her four-year-old grandchild being grazed by a stray bullet.
Felicia Allen, Davis's daughter and Lucius's sister, testified to witnessing several shootings at CBA, although some of her accounts appear to be the same shootings testified to by Davis.
Joe Cooper, owner of the security company which provided security at CBA until September, 2001, testified that one of his security guards was shot while on duty at CBA. Cooper also testified to hearing gunshots in the general vicinity of CBA.
Yolanda Howard, former leasing agent for CBA who worked at an office on CBA premises, testified to a shooting incident which occurred in broad daylight in front of the CBA office. Howard testified that during this incident, a car was "shot up" in the common area in front of the CBA office. Howard also *402 testified to hearing gunshots on the premises. Further testimony from Howard indicated that she disagreed if Christian Brotherhood employees claimed that they were not aware of criminal activity at CBA.
Vera Sutton, assistant manager at CBA, testified that the CBA office had been burglarized.
Robert Douglas Ricks, a tenant at CBA at the time of Lucius's death and preceding, testified that there were fights and shootings "everyday" at CBA, and that, in his opinion, CBA "ain't safe." Officer Lance Scott, an officer of the Jackson Police Department who patrolled the precinct encompassing CBA from 2000-2004 and was familiar with CBA, testified that there were fights and shootings at the complex all the time prior to Lucius's death. Officer Scott also testified that he was the officer that responded to the shooting involving Younger and Lucius on February 4, 2003. Officer Scott testified that this particular shooting did not surprise him "[d]ue to the geographical area and the number of homicides that had been occurring in that area. . . . "
¶ 25. In addition to the deposition testimony detailing specific and general incidents of criminal activity, Davis presented JPD crime statistics for the precinct and beat encompassing CBA. These statistics reflect that there were approximately 676 crimes against persons reported in precinct three, beat five,[7] between January 1, 2000, and December 31, 2002. Davis also submitted a JPD activity log which reflects police activity at CBA between January 1, 2000, and August 1, 2004.[8] This log contains reports of hundreds of incidents involving the JPD which either originated from or references 3930 Skyview Drive, the address of CBA, in some respect. While a significant number of the log entries involved nonviolent activity or activity which would otherwise not be evidence of an atmosphere of violence at CBA, we note that the log does contain a significant amount of activity which would be indicative of a violent atmosphere at CBA. Among the entries reported on the activity log in connection with CBA are multiple entries reflecting the following: shots fired, fights, arson, man with gun, possession of narcotics, malicious mischief, disturbance, stabbing, simple assault, aggravated assault, rape, auto theft, shooting w/intent, disturbing the peace, burglary, armed robbery, trespassing, among others.
¶ 26. Christian Brotherhood contends that the evidence contained in the JPD crime statistics for precinct three, beat five and in the activity log reflecting police activity at CBA are not conclusive evidence that the crimes reflected by each were actually committed, and hence do not evince an atmosphere of violence at CBA. We disagree. While the evidence presented might not conclusively establish that any individual crime reflected therein was actually committed, the crime statistics and activity log are at least some evidence *403 that violent crimes were frequently committed at or in the vicinity of CBA. In other words, this evidence makes "the existence of [a] fact that is of consequence to the determination of the action . . . more probable than it would be without the evidence." M.R.E. 401. Furthermore, there is ample authority for the use of such reports and statistics in determining whether criminal activity was reasonably foreseeable.
¶ 27. In Doe, we relied in part on "copies of reports prepared by the Clinton Police Department" in finding that an atmosphere of violence arguably existed at the apartment complex at issue. Doe, 941 So.2d at 829-30(¶ 37). In Crain, our supreme court concluded that "it would be difficult to say the assault on Crain was foreseeable" based on the following:
[T]here had been only two reports of crime on the premises within the year prior to the assault on Crain. In February, 1984, burglars entered through the roof of the Lodge, and stole $643.00 from game machines. Later that year, in October, a tire and C.B. radio were stolen from a vehicle parked at the Lodge. These incidents, in and of themselves, hardly seem adequate to put Moose Lodge on notice that a serious assault upon an invitee was foreseeable. As to the incidence of crime in the vicinity of the Moose Lodge, the record indicates that in fifty-five of the sixty months prior to the attack on Crain there were numerous commercial burglaries and reports of larceny in the vicinity of the Moose Lodge, but there were only eleven assaults, robberies and other violent crimes in that five year period.
Crain, 641 So.2d at 1192 (emphasis added). In addressing the sufficiency of evidence considered by a jury in returning a verdict in favor of the plaintiff/victim, our supreme court in Gatewood v. Sampson, 812 So.2d 212, 220, 221 (¶¶ 15, 17) (Miss.2002) held that evidence of "sixty violent crimes . . . reported to police in the neighborhood" surrounding the subject premises within the three years prior to the attack was sufficient to create a "factual question [of] whether an atmosphere of violence existed." Accordingly, the JPD crime statistics for precinct three, beat five and the activity log reflecting criminal activity at CBA may be properly considered as evidence of an atmosphere of violence at or in the vicinity of CBA.[9]
¶ 28. We find that "the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises," as evidenced by the JPD crime statistics for precinct three, beat five, and "the frequency of criminal activity on the premises" of CBA, as evidence by the JPD activity log which reflects criminal activity reported at CBA, present a factual issue as to whether Christian Brotherhood had actual or constructive knowledge that an atmosphere of violence existed on the premises of CBA. The deposition testimony of specific incidents of criminal activity, summarized above, further supports our conclusion. The numerosity and frequency of the criminal activity presented in this case far exceeds the evidence which we found sufficient in Doe to create a genuine *404 issue of material fact with respect to this element of negligence.
¶ 29. A finding that Christian Brotherhood had a duty to protect Lucius Davis and other invitees from the foreseeable criminal activity of third parties, however, is only the first element that Davis must establish in order to withstand summary judgment. We turn now to the question of whether a genuine issue of material fact exists with respect to whether Christian Brotherhood breached the duty owed to Lucius Davis.
B. WHETHER CHRISTIAN BROTHERHOOD BREACHED THE DUTY IT OWED TO LUCIUS
¶ 30. Having determined that the duty Christian Brotherhood owed to Lucius was to protect against the foreseeable criminal acts of third parties, we find that there is a genuine issue of material fact with respect to whether Christian Brotherhood breached that duty. Ordinarily, breach is determined in reference to the "reasonable person" standard of care. In other words, when a person fails to act as would a reasonable person under the same or similar circumstances, that person is said to have breached the applicable standard of care. See Baker, Donelson, Bearman & Caldwell, P.C. v. Muirhead, 920 So.2d 440, 449(¶ 35) (Miss.2006) (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 32 at 175 (5th ed.1984) in stating that "[n]egligence is `a failure to do what the reasonable person would do under the same or similar circumstances.'")
¶ 31. In the instant case, Davis contends that Christian Brotherhood should have maintained security guards on the premises, should have provided a gated keypad entry onto the premises, and should have maintained better lighting in the common areas at CBA. There is no dispute that security guards were no longer employed at CBA after September of 2001. Similarly undisputed is the fact that Christian Brotherhood did not restrict access to CBA through the use of gates which would be accessible only by entry of a security code into a keypad at CBA's entrance. In light of the criminal activity at and around the premises of CBA, we find that a reasonable jury could conclude that CBA breached the applicable standard of care by failing to provide these security measures. We will now address whether Christian Brotherhood's failure to provide any of the mentioned security measures proximately caused the shooting death of Lucius Davis.
C. WHETHER CHRISTIAN BROTHERHOOD'S FAILURE TO PROVIDE SECURITY WAS THE PROXIMATE CAUSE OF LUCIUS'S DEATH
¶ 32. Proximate cause is a concept which is more accurately defined by reference to the distinct concepts of which it is comprised, which are: "(1) cause in fact; and (2) foreseeability." Johnson v. Alcorn State Univ., 929 So.2d 398, 411(¶ 48) (Miss.Ct.App.2006) (quoting Ogburn v. City of Wiggins, 919 So.2d 85, 91(¶ 21) (Miss.Ct.App.2005)). "Cause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred. Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." Id. We begin with a discussion of whether Christian Brotherhood should have anticipated the dangers created by the failure to provide security at CBA.
¶ 33. Christian Brotherhood repeatedly asserts that it could not have *405 foreseen that two accomplices to a burglary would get into an argument over that burglary in the back seat of a car and one end up shooting the other. We are not persuaded by this argument. "Foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." Ogburn, 919 So.2d at 92(¶ 21). Rather, "what is required to be foreseeable is the general nature of the event or harm, not its precise manner or occurrence." Crain, 641 So.2d at 1190 (quoting Onciano v. Golden Palace Rest., 219 Cal.App.3d 385, 268 Cal.Rptr. 96, 98 (1990)). In the instant case, Lucius was injured by the criminal activity of a third party on the premises of CBA. This is exactly the risk and type of harm against which Christian Brotherhood had a duty to protect Lucius and other invitees at CBA. That Christian Brotherhood could not anticipate the exact sequence of events leading up to the actual shooting is of no consequence when assessing the foreseeability of the dangers created by their acts or omissions. In light of the nature, amount, and frequency of the crimes against persons reported at and in the vicinity of CBA, we find that a reasonable jury could conclude that an individual being shot and killed on the premises of CBA was foreseeable.
¶ 34. Another argument advanced by Christian Brotherhood involves precedent which, at first blush, appears to support Christian Brotherhood's assertion that Younger was the superceding cause of Lucius's death. According to our supreme court, "[n]egligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof." Titus v. Williams, 844 So.2d 459, 466(¶ 25) (Miss.2003) (quoting Newell v. Southern Jitney Jungle Co., 830 So.2d 621, 623 (Miss.2002)). Christian Brotherhood cites the preceding language from Titus for the proposition that, since Christian Brotherhood merely furnished the "condition or occasion" upon which Lucius was killed, but did not "put in motion the agency by or through which the injuries are inflicted," Troy Younger's independent act of shooting Lucius was the superceding cause of Lucius's injuries, absolving Christian Brotherhood of any liability. We find Christian Brotherhood's argument to be without merit.
¶ 35. The supreme court in Titus clearly made a distinction between active and passive negligence, stating that "[o]ne is only passively negligent if he merely fails to act in fulfillment of duty of care which law imposes upon him, while one is actively negligent if he participates in some manner in conduct or omission which caused injury." Id. at 466(¶ 27) (quoting Black's Law Dictionary 718 (6th ed.1991)). That distinction was important in Titus because the trial court found that the plaintiff was, at most, a licensee on the premises at issue. The well settled law of premises liability in Mississippi is that a landowner merely owes a licensee or trespasser the duty "to refrain from willfully or wantonly injuring him." Little, 719 So.2d at 760(¶ 16). Accordingly, a premises owner is not liable to a licensee or trespasser for injuries incurred because of the owner's failure to act. The plaintiffs in Titus argued that the defendants' "actual and/or constructive knowledge that an atmosphere of violence existed on the premises constituted active or affirmative negligence." Titus, 844 So.2d at 465(¶ 21). Citing Hoffman v. Planters Gin Co., 358 So.2d 1008 (Miss.1978) where the supreme court held that the licensee/invitee distinction did not apply in cases of active or affirmative negligence, the plaintiffs argued that the defendants had a duty to *406 provide protection from third party criminal activity, even if the injured party is deemed a licensee or trespasser. Titus, 844 So.2d at 465(¶ 21). The Titus court concluded that the plaintiffs' allegations involved only passive negligence and, as such, the "Hoffman exception" did not apply to the facts of that case. Id. at 465(¶ 22).
¶ 36. We do not read Titus as obviating a business premises owner's duty to "protect[] tenants from the foreseeable criminal acts of others." Price v. Park Mgmt., 831 So.2d 550, 551(¶ 6) (Miss.Ct.App.2002) (citing Tharp v. Bunge Corp., 641 So.2d 20, 25 (Miss.1994); O'Cain v. Harvey Freeman & Sons, Inc., 603 So.2d 824, 830 (Miss.1991)). Rather, we read Titus as further explaining the affirmative/passive negligence dichotomy as these concepts relate to the duty owed to invitees, licensees, and trespassers. To be sure, the duty to protect invitees from third party criminal activity would be rendered meaningless if the very danger for which protection is required could be considered the superceding cause of injury. In the instant case, Lucius was an invitee to whom Christian Brotherhood owed a duty to provide protection from the foreseeable criminal acts of others, notwithstanding the fact that Christian Brotherhood did "not put in motion the agency by or through which [Lucius's] injuries [were] inflicted." This is so because the "agency by or through which [Lucius's] injuries [were] inflicted" is the very danger for which Christian Brotherhood had a duty to provide protection, and hence, the criminal act of Troy Younger was not the superceding cause of Lucius's injuries. However, to establish proximate cause, it must also be shown that the failure to implement reasonable security measures was the cause in fact of the injury.
2. Whether Christian Brotherhood's failure to provide adequate security was the cause in fact of Lucuis' death
¶ 37. In rendering its bench ruling that there was no genuine issue with respect to the element of proximate cause, the trial court stated that "assuming all of the facts proffered by [Davis] are true, you could have had a policeman or a security guard at every corner in the complex, and it wouldn't have prevented what happened." We perceive the trial court's statement as bearing on the cause in fact prong of proximate causation.
¶ 38. As previously mentioned, "[c]ause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred." Johnson v. Alcorn State Univ., 929 So.2d 398, 411 (¶ 48) (Miss.Ct.App.2006) (quoting Ogburn v. City of Wiggins, 919 So.2d 85(¶ 21) (Miss.Ct.App.2005)). Stated differently, cause in fact requires proof that, but for the alleged negligent act or omission, the injury would not have occurred. To survive summary judgment on this element, there must be evidence that, had Christian Brotherhood provided the security measures which Davis claims Christian Brotherhood had a duty to provide, Troy Younger would not have shot Lucius Davis on February 4, 2003. We are not persuaded that Davis has met this burden.
¶ 39. Davis contends that Christian Brotherhood should have provided the following on the premises of CBA: security guards, a gated entrance restricted by a security keypad, and better lighting of the parking lot and other common areas. We note that these security measures have the potential to prevent third party criminal activity by either (1) keeping potential criminals who are not tenants or guests of tenants from coming upon the premises, or (2) by discouraging criminal activity by *407 those who are on the premises. We will now analyze whether there is any evidence in the record from which a trier of fact could conclude that, more likely than not, the security measures mentioned above would have either prevented Younger from being on the premises or deterred him from shooting Lucius.
¶ 40. Christian Brotherhood asserts that Lucius and Younger had been together socializing several hours prior to the shooting, and further contends that the pair were accomplices in the burglary of CBA tenant Robert Ricks's apartment prior to the shooting. Ricks testified in his deposition that Lucius returned some of the items that were stolen from his apartment and said "I'm sorry." Ricks also testified to having seen the pair together peacefully socializing several hours prior to the shooting. Davis refutes that Lucius took part in the burglary, citing the inconsistencies between Ricks's deposition testimony and the police burglary report, completed the night of the burglary, which states that there was "no suspect information" given to police by Ricks. Davis also points to the deposition testimony of Kelonzo McElroy, whose deposition testimony is the only eyewitness account of the shooting which appears in the record. McElroy testified that when Younger accused Lucius of burglarizing Ricks's apartment, Lucius denied taking part. Even assuming, without deciding, that there is a genuine dispute as to whether Lucius was involved in the burglary, we are still not persuaded that there is a genuine issue as to whether the presence of security guards or other security measures would have prevented the shooting.
¶ 41. As to the contention that Younger would have been kept off of the premises, Davis points to no evidence which establishes that Younger would have been prevented access to CBA by security guards or a gated keypad entrance. There is undisputed testimony in the record that Lucius and Younger had been seen together socializing peacefully prior to the shooting.[10] From this fact alone, it is reasonable to conclude that Younger was on the premises of CBA as a guest and would have been there notwithstanding security measures designed to prevent persons with no connection to CBA from gaining entry. Not only has Davis failed to provide evidence which establishes that Younger would have been denied access to CBA, we note that the only record evidence having any bearing on the issue tends to demonstrate the opposite.[11] Accordingly, there is no evidence from which a trier of fact could conclude that the security measures proposed by Davis would have prevented Younger from being on the premises of CBA at the time of the shooting.
¶ 42. With respect to Davis's allegation that security guards and improved lighting would have deterred the shooting, we are not persuaded that the record supports *408 her contention. According to deposition testimony, the altercation between Lucius and Younger occurred while Lucius and other occupants of a car waited in the parking lot for the police to leave CBA because the driver did not have a driver's license and was afraid of being pulled over. Apparently, JPD police officers were still at CBA investigating the burglary of Ricks's apartment while the events leading up to the shooting unfolded. If the presence of JPD on the premises of CBA did not deter Younger from shooting Lucius, we fail to see how a jury could conclude that security guards would have provided any deterrence. As to the claim of inadequate lighting, the record does not reveal any evidence that the lighting at CBA was inadequate, much less demonstrate that improved lighting would have deterred Younger from shooting Lucius.[12] The account of the shooting contained in the record describes a sudden, unexpected shooting that appears to have occurred in the heat of the moment. While perhaps exaggerated to a certain extent, we find some truth in the following statement made by the trial court in ruling on this issue: "you could have had a policeman or a security guard at every corner in the complex, and it wouldn't have prevented what happened."
3. Whether the affidavit of JPD Commander Tyrone Lewis creates a genuine dispute on the issue of proximate cause
¶ 43. The only evidence contained in the record which we find supports Davis's argument that a lack of security guards and inadequate lighting was the proximate cause of Lucius's death is the affidavit of Commander Tyrone Lewis, a JPD officer designated by Davis as an expert in the fields of security and law enforcement. Commander Lewis stated in his affidavit that "[t]he cause of the death of Lucius Davis was the Defendants' failure to have any security guards or other security measures. These security guards would have stopped Troy Younger from loitering and starting a fight with Lucius Davis in the parking lot, which preceded Lucius Davis's death." On the issue of inadequate lighting, Commander Lewis stated in his affidavit that lighting at CBA "was so poor, that Lucius Davis could not initially be identified by family members. It is well known in my field of expertise that inadequate lighting increases the chance of criminal activity, and the inadequate lighting at CBA on February 4, 2003 contributed to the death of Lucius Davis." In ruling on Christian Brotherhood's motion for summary judgment, the trial court stated, in referring to Commander Lewis's affidavit, that "it's nothing more than just a compilation of conclusory statements [and] provides no factual basis." The court further opined that the majority of the testimony contained in the affidavit "would be objectionable, and what would survive would not provide material relevant evidence that would defeat a motion for a directed verdict." We agree.
¶ 44. Davis points out that according to Rule 704 of the Mississippi Rules of Evidence, "[t]estimony in the form of an opinion or inference" is not inadmissible simply because that testimony "embraces an ultimate issue to be decided by the trier of *409 fact." Based on Rule 704, Davis argues that Commander Lewis's conclusion that a lack of security guards caused Lucius's death and that a lack of adequate lighting contributed to the death of Lucius is proper and would be admissible at trial, notwithstanding the fact that this testimony "embraces an ultimate issue to be decided by" a jury. What Davis overlooks, however, is that Rule 702(1) requires an expert's opinion testimony to be "based upon sufficient facts or data." M.R.E. 702(1). Although the trial judge did not specifically refer to Rule 702 in making his determination with respect to Commander Lewis's affidavit, we find that the court's ruling that there was no "factual basis" for Commander Lewis's conclusions implicates Rule 702(1).
¶ 45. The Mississippi Supreme Court recently adopted the modified Daubert standard for determining the admissibility of expert witness testimony. Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 39-40 (¶¶ 23-25) (Miss.2003). There, the court engaged in an in-depth discussion of the Mississippi and Federal Rules of Evidence with respect to Rule 702 in particular and the admissibility of expert testimony generally. According to the court, to be admissible, expert testimony must be relevant and reliable, and the trial judge is the gatekeeper in determining "whether the testimony rests on reliable foundation and is relevant to a particular case." Id. at 36(¶ 11) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). While we do not question the relevance of the testimony contained in Commander Lewis's affidavit, we agree with the trial judge that there is no "factual basis" for Commander Lewis's conclusions, and therefore the trial court properly disregarded the affidavit's conclusions on causation because Commander Lewis's opinions lacked reliability.
¶ 46. According to our supreme court in McLemore, "the facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." Id. at 36(¶ 8) (quoting Hickox v. Holleman, 502 So.2d 626, 638 (Miss. 1987)). Accordingly, the proponent of the expert's testimony must demonstrate that such testimony is not based "merely [on] his subjective beliefs or unsupported speculation." Id. at (¶ 11) (citing Daubert, 509 U.S. at 590, 113 S.Ct. 2786). Furthermore, "neither Daubert nor the Federal Rules of Evidence requires that a court `admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,' as self-proclaimed accuracy by an expert [is] an insufficient measure of reliability." Id. at 37(¶ 13) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).
¶ 47. We find no evidence in the record to support Commander Lewis's conclusion that security guards would have expelled Troy Younger from the premises of CBA, thereby preventing Younger from shooting and killing Lucius Davis. There is no indication that Younger was not at CBA by invitation, and in fact, the undisputed evidence contained in the record tends to indicate the opposite. Nor do we find any evidence to support Commander Lewis's conclusion that inadequate lighting at CBA contributed to Lucius's death. While Commander Lewis's expertise in law enforcement and general security may be sufficient to support his conclusion "that inadequate lighting increases the chance of criminal activity," we find that neither this correlation between lighting and criminal activity, nor any other record evidence, is sufficient to support Commander Lewis's conclusion that the lighting *410 at CBA was inadequate and that this inadequacy contributed to Lucius's death. An expert's opinion "must be supported by appropriate validation i.e., `good grounds', based on what is known." Daubert, 509 U.S. at 590, 113 S.Ct. 2786. From our review of the record, we cannot discern the "good grounds" upon which Commander Lewis based his opinions, and his opinions do not appear to be "based upon sufficient facts or data." M.R.E. 702(1). Consequently, the trial judge did not abuse his discretion as gatekeeper in ruling that the opinions contained in Commander Lewis's affidavit were merely "conclusory" and had no "factual basis." The trial judge properly disregarded this evidence in rendering summary judgment for Christian Brotherhood.

CONCLUSION
¶ 48. Although Davis correctly points out that the issue of proximate cause is generally an issue for a jury to decide, this fact does not change the requirement that, to withstand a motion for summary judgment, the non-moving party must present evidence that would allow a jury to find that the breach proximately caused the injury at issue. See Hankins Lumber Co. v. Moore, 774 So.2d 459, 464(¶ 11)(Miss.Ct.App.2000) (stating that "[w]hen reasonable minds might differ on the matter, questions of proximate cause . . . are generally for determination of [the] jury") (citation omitted). Davis failed to meet this burden. Accordingly, we agree that there is no genuine issue of material fact with regard to whether a lack of security measures was the cause in fact of Lucius's death, and therefore, we affirm summary judgement in favor of Christian Brotherhood Homes of Jackson, Mississippi, Inc., William E. McKnight, and Southland Management Corporation.
¶ 49. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] We will refer to the Appellees collectively as "Christian Brotherhood."
[2] Bernice subsequently amended the complaint twice, the final complaint having been filed on August 6, 2004. The effect of the final amended complaint was to add Southland as an additional defendant to the action.
[3] According to Southland 30(b)(6) representative Rick Green, these two organizations were more like "sponsors" than owners. Green stated that low-income apartments such as CBA were primarily a result of the efforts of HUD, with nonprofit organizations basically "lend[ing] their name to it, and then they might put up a little seed money."
[4] Green testified at his 30(b)(6) deposition that CBH did not "have a day-to-day, month-to-month active role" in managing CBA.
[5] This evidence of criminal activity will be described in more detail in our analysis section.
[6] For clarification of the preceding statement, we mention the situation where one or more of the elements of negligence are undisputed or have been conclusively established in favor of the non-moving party. This obviously would prevent summary judgment based only on that element even though there is no "genuine issue of material fact" with respect to that element. In the case sub judice, for example, the fact that Lucius Davis's death resulted in at least some damages is not disputed.
[7] According to the City of Jackson precinct map included in the record, beat five appears to be one of eleven total beats encompassed by precinct three and represents a relatively small area in comparison to the entire precinct. Although we found no description which discloses the exact size of the geographical area represented by beat five, we note that beat five is rectangular in shape and appears to cover only a few square miles, at most, within precinct three. We give this rough estimate to give perspective to the JPD crime statistics contained in the record.
[8] We note that only those incidents which occurred prior to February 4, 2003 are relevant to the issue of Christian Brotherhood's actual or constructive notice of an atmosphere of violence.
[9] We note that there may be other issues facing a trial judge on the issue of admissibility of such evidence at trial. See American National Insurance Co. v. Hogue, 749 So.2d 1254 (Miss.Ct.App.2000) (affirming trial court judge's decision to allow admission of compilations of police reports). For purposes of summary judgement, however, Christian Brotherhood cites no authority which would preclude consideration of such evidence by this Court or by the trial court.
[10] Counsel for Davis included in appellant's "Record Excerpts" portions of deposition testimony which are not part of the record. These excerpts were included to refute, inter alia, evidence which establishes that Younger and Lucius had been together socializing prior to the shooting. As explained above, we may not consider evidence which is not part of the record or which was not considered by the trial court.
[11] We reach this conclusion notwithstanding the affidavit of Commander Tyrone Lewis, who stated that "security guards would have stopped Troy Younger from loitering and starting a fight with Lucius Davis in the parking lot. . . ." The affidavit does not indicate the facts upon which Commander Lewis based his statement, and our review of the record does not reveal facts sufficient to compel this conclusion. We will discuss Commander Lewis's affidavit more fully below.
[12] Again, we reach this conclusion notwithstanding Commander Lewis's affidavit stating that "inadequate lighting increases the chance of criminal activity, and the inadequate lighting at CBA on February 4, 2003 contributed to the death of Lucius Davis." The record does not reveal any evidence to support Commander Lewis's conclusion that the lighting at CBA contributed to Lucius's death and an increase in "the chance of criminal activity" is insufficient to support that conclusion.