GRIFFIS, P.J.,
dissenting:
¶ 31. I respectfully dissent.
¶32. In Daniels v. GNB, Inc., 629 So.2d 595, 599 (Miss.1993), the supreme court held:
All motions for summary, 'judgment should .be viewed with great skepticism and if the trial court is to err, it is better to err on the side of denying the motion. When doubt exists whether there is a fact, issue, the non-moving party gets its benefit. Indeed, the party against whom the summary judgment is sought should be given the benefit of every reasonable doubt.
A motion for summary judgment should be overruled unless the trial court finds, beyond any reasonable doubt, that the plaintiff- would be unable to prove any facts to support his claim. If facts are in.dispute, it is not the province of the trial court to grant summary judgment thereby supplanting a full trial with its ruling. “Accordingly, the court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried.”
(Internal citations omitted). This Court’s de-novo review of the motion for summary judgment requires that we decide whether there are issues to be tried.
¶ 33. The majority has determined that “[i]t is unreasonable to hold 21 Apartments to a precognitive duty to warn Andreas that Batiste was a violent person based solely on Batiste’s expressed desire to avoid violence.” The majority then concludes that “[a]s a matter of law, we find that Batiste’s resident-concern form did not provide 21 Apartments with actual or constructive knowledge that Batiste was a violent person. It follows that 21 Apart *94 ments did not have a duty to warn Andre-as that Batiste was a violent person.”
¶ 34. The circuit court correctly stated the applicable law:
“The criminal acts of a third party may be deemed reasonably foreseeable if the premises owner had cause to anticipate such acts.” Davis v. Christian Brotherhood Homes of Jackson, Mississippi, Inc., 957 So.2d 390, 402 [401] (¶ 22) (Miss.Ct.App.2007). “Cause to anticipate may be imputed to the premises owner by virtue of his (1) actual or constructive knowledge of the third party’s violent nature, or (2) actual or constructive knowledge that an atmosphere of violence existed on the premises.” Id.
I agree with that this is not an “atmosphere of violence” case. Instead, the Ga-lantees survive summary judgment if they can show that there is a genuine issue of a material fact in dispute as to “whether 21 Apartments had actual or constructive knowledge of Batiste’s violent nature, prior to Galanis’[s] murder.”
IT 35. The Galanises argue that there was a genuine issue of a material fact that would establish actual or constructive notice by 21 Apartments.' They claim that (a) 21 Apartments knew Batiste had pled guilty to the felony of uttering forgery, (b) an investigative report from Lauderdale County indicates Batiste was arrested for simple assault on June 11, 2002, and (c) Batiste had threatened to “get violent” in the resident concern form he filed against Arthur Hosey. The majority and the circuit court rejected all three arguments. I disagree.
¶ 36. I begin with the resident concern form. Batiste complained to 21 Apartments about his then-roommate:
I can’t take it anymore. I don’t want to get violent. He’s had to[o] many chances. I wish he would leave now because I can’t stay in an environment where ever time I turn around I have a fly in my room. I keep my things clean and my room organized. He doesn’t even take out the trash. I hope this get resolved soon because I really don’t want to take matters in my own hands.
(Emphasis added).
¶ 37. The circuit court found that “[t]here is nothing in the evidence before this [cjourt to indicate that Batiste ever acted on this statement.” Indeed, if Batiste had acted on this threat, there would be no question that 21 Apartments had a duty to warn future roommates. But such is not the case here. Instead, the question is whether there are any facts in dispute that would allow reasonable minds to conclude whether this statement was sufficient to establish 21 Apartments had actual or constructive knowledge of Batiste’s “propensity for violence.”
¶ 38. What did Batiste communicate to 21 Apartments when he said, “I don’t want to get violent”? The majority reasons that “it is unreasonable to view Batiste’s resident-concern- form in a vacuum as though 21 Apartments only had it as a means to determine whether Batiste was a violent person.” In fact, I agree with the majority that “[t]his statement is ambiguous in that it is open to multiple interpretations.” However, I do not attempt to make the interpretation as to what Batiste meant with the language he used and what 21 Apartments understood when it received this form. Certainly, I cannot accept the majority’s and the circuit court’s interpretation that Batiste only meant something nonviolent.
¶ 39. I do not know what Batiste meant when he wrote “I don’t want to get violent” or “I really don’t want to take matters in my own hands.” A reasonable person could conclude that this negative *95 statement also expressed the intent to “get violent.”
¶40. For the purpose of summary-judgment, the standard of review requires that we review all evidentiary matters in the light most favorable to the nonmoving party and give the nonmoving party the benefit of every reasonable doubt. Applying this standard of review, I cannot accept the “literal” interpretation by the majority and the circuit court. Instead, I find that reasonable minds may interpret this language differently. Thus, the words Batiste chose to use indicate to me that a possible interpretation of “get violent” could be a threat of violence. The interpretations offered by the majority and the circuit court, in my opinion, are mere speculation.
¶ 41. The Galanises also point to the testimony of Debbie Owen. 21 Apartments offered the affidavit of Owen to support its motion for summary judgment. There, Owen stated, “I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies.” As an employee of 21 Apartments, Owen signed arid received Batiste’s resident concern form on April 17, 2007. She then stated that she did not read the resident concern form when Batiste gave it to her. Instead, she placed it on the desk of her boss, Nandra Jackson.
¶ 42. At her deposition, Owen testified:
Q. You didn’t really take a look at this until after you had offered your affidavit in this case?
A. • I don’t remember, actually, when I actually saw it, to be honest.
Q. And again, in your affidavit, you say that, “I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies.” Obviously, if you had read this before you did. that affidavit, where he clearly states, “I don’t want to get violent,” that would be in contradiction to what’s in your affidavit; correct?
A. I didn’t read this, though.
Q. Right. Because it’s in contradiction to what’s in your affidavit.
A. I don’t understand what you’re saying tó me, or what you’re asking me.
Q. Well, I guess what I’m saying is this, Debbie: You did an affidavit and said, “I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies.”
A. That’s correct.
Q. That’s correct. And had you read this beforehand—
A. I would have known.
Q. You would have known, and you would not have put that in your affidavit?
Q. Correct?
A. Correct.
¶43. Owen’s deposition testimony, in my opinion, indicates that there is a genuine issue of a material fact in dispute as to whether 21 Apartments had actual or constructive knowledge of Batiste’s “propensity for violence.”
¶ 44. The Galanises also argue that 21 Apartments had a duty to warn Andreas of Batiste’s foreseeable criminal acts. To support this claim, they argue that a landowner owes “an invitee the duty ‘to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not in plain and open view.’ ” Massey v. Tingle, 867 So.2d 235, 239 (¶ 13) (Miss.2004) (other citations omitted). These duties are sepa *96 rate duties. Mayfield v. The Hairbender, 903 So.2d 733, 738 (¶ 20) (Miss.2005). The breach of either duty will support a negligence claim, and they must be separately analyzed. Id.
¶ 45. The Galantees offer the following facts to support the duty to warn. 21 Apartments first discovered Batiste’s criminal history in February 2007, as a result of the background check they were performing for his lease renewal. Once 21 Apartments ■ discovered Batiste’s criminal history, it.informed Batiste that he could not work for 21 Apartments, that his renewal, rental application had been denied, .and that his lease would not be renewed. Batiste convinced 21 Apartments to make an exception for him, which would allow him to remain a tenant, despite his criminal history. In July 2007, almost six months later; Batiste’s attorney sent a letter along with a copy of a nonadjudicated order for credit-card- theft in Kemper .County, Mississippi. The Galantees contend that these documents notified 21 Apartments that Batiste had pled guilty to the felony of credit-card theft. Thus, the Galantees argue that 21 Apartments failed to maintain a reasonably safe premises by allowing Batiste to participate in its roommate-matching program with his ' past criminal history and threats against previous roommates.
• ¶ 46. The Galantees also point to evidence of 21 Apartments employees. Owen admitted that it was against 21 Apartments’ policy to allow tenants with a criminal history to live at 21 Apartments. Butler also stated that there was a “zero tolerance” policy preventing lease agreements with applicants that had a negative criminal background check. They conclude that 21 Apartments made an exception to the “zero tolerance” policy to allow Batiste to' live there; it did not make an exception that would allow Batiste to work for 21' Apartments. Hence, they claim that 21 Apartments was not going to give an admitted credit-card thief an opportunity to. steal from 21 Apartments as an employee, but they did not mind giving Batiste an opportunity to steal from an unsuspecting roommate while they- collected his rent payments. As a result, the Galantees conclude that “[t]he party in the best position to eliminate a dangerous condition should be burdened with that responsibility.” Tharp v. Bunge Corp., 641 So.2d 20, 25 (Miss.1994). 21 Apartments was in the best position to eliminate the dangerous condition by simply adhering to its “zero tolerance” policy. It concludes that had 21 Apartments not changed its initial decision not to renew a lease with Batiste, Andreas would not have been placed in a dangerous environment.
¶ 47. In addition, the Galantees point to 21 Apartments’ response when Andreas told 21 Apartments that he had discovered that a significant amount of money was missing from his bank account and that his credit card had been stolen. He told 21 Apartments that he suspected Batiste, and he sought guidance from 21 Apartments. Instead of counseling Andreas that Batiste’s criminal history could present a dangerous condition, • 21 Apartments said nothing.
¶ 48. The question for us. to decide is whether 21 Apartments has met its burden for purposes of summary judgment. “A duty to warn arises when there is a dangerous condition.” Richardson v. Grand Casinos of Miss., Inc., 935 So.2d 1146, 1149 (¶ 10) (Miss.Ct.App.2006). I find that there are genuine issues of a material fact in dispute as to whether 21 Apartments had a duty to warn Andreas of Batiste’s criminal history and threats.
¶ 49. Next, the Galanises argue that 21 Apartments had a heightened self-imposed duty not to allow Batiste to lease with *97 other roommates in the roommate-matching program. 21 Apartments had a duty to provide reasonably safe premises to its tenants. Once 21 Apartments became aware of Batiste’s criminal history and/or violent nature, it should not have allowed him to continue residing at the apartment complex. Despite having a “zero tolerance” policy for criminal history, 21 Apartments changed its decision not to renew. Batiste’s lease, and allowed him to be paired with Andreas in the roommate-matching program.
¶ 50. When Andreas signed his rental application for 21 Apartments, a portion of. the application he completed dealt with the roommate-matching program, which “assign[s] rooms based on the interest, study and living habits” of roommates. As part of the application process, Andreas (and all other tenants or prospective tenants) agreed to a necessary investigation of “credit, character, and reputation,” including a criminal background check. 21 Apartments’ operation manual states its policy that “conducting a thorough background check prior to accepting an application for residency is critical and is policy.” When Andreas consented to the background investigation, he was placed on notice that a criminal history would result in denial of the application. Thus, 21 Apartments implicitly agreed to match An-dreas with a roommate that had also passed his criminal background check. Essentially, 21 Apartments contractually agreed to perform the due diligence for Andreas pertaining- to properly yetting his “matched” roommates.
¶ 51. By consenting to participate in the roommate-matching program, Andreas believed that any potential roommate 21 Apartments paired him with would have undergone the same scrutiny. The roommate-vetting service was a duty created and assumed by 21 Apartments. The duty to perform a background check and properly screen tenants was part of the agreement 21. Apartments made to each tenant, not just Andreas. This was a self-imposed and created duty to invitees that is greater than the normal common-law duties owed to invitees. See Doe v. Wright Sec. Servs., 950 So.2d 1076, 1080 (¶ 13) (Miss.Ct.App.2007) (stating that a “duty also exists where a party contracts to undertake or otherwise assumes a duty”).
¶ 52. The Galanises argue that 21 Apartments created a duty that did not otherwise exist by agreeing to run background checks on tenants, participating in. their roommate-matching program. In so doing, 21. Apartments had a heightened and special duty to provide Andreas with reasonably safe premises on which to live and to warn Andreas of Batiste’s history. 21 Apartments breached this heightened duty by allowing Andreas to be “matched” with a known criminal. Pursuant to 21 Apartments’ policies, Batiste should not have been allowed to lease from 21 Apartments, and his continued tenancy was in violation of the policy. 21 Apartments’ breaches, coupled .with its failure to inform Andreas of the information it had about Batiste, were the proximate cause of An-dreas’s death.
¶ 53. For these reasons, I respectfully dissent.
MAXWELL AND JAMES, JJ., JOIN THIS OPINION. ISHEE, J., JOINS THIS OPINION IN PART.