# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00418-COA

**OLIVIA ALDRIDGE, NATURAL MOTHER AND GUARDIAN OF MATTHEW T. BROWN, A MINOR**                                                            **APPELLANT**

**v.**

**SOUTH TIPPAH COUNTY SCHOOL DISTRICT**                                                            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/27/2023 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILIP CAREY HEARN |
| | CHARLES CASSIDY COLE |
| ATTORNEYS FOR APPELLEE: | DANIEL JUDSON GRIFFITH |
| | MARY McKAY GRIFFITH |
| | ARNULFO URSUA LUCIANO |
| | McKENZIE W. PRICE |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 08/20/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On June 17, 2021, Olivia Aldridge filed a lawsuit against South Tippah County School District (School District) as the natural mother and guardian of her son Matthew Brown, who was a minor at the time of the lawsuit.[1] Aldridge's lawsuit asserted multiple acts of alleged negligence resulting in certain injuries Brown sustained while he was on the campus of Blue Mountain High School.  On October 3, 2022, the school district filed a motion for summary

---

[1] Matthew and the other students mentioned here are now over the age of eighteen, and their full names will be used rather than initials as they appear in portions of the record.

judgment claiming there was no evidence that any alleged breach of duty by the school district was the proximate cause of Matthew's injuries. After a hearing on February 21, 2023, the circuit court entered an order on February 27, 2023, granting the school district's motion for summary judgment. Aggrieved by the circuit court's ruling, Aldridge appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. On May 6, 2020, Brown and a few other boys, including David Peterson, were transported by bus from a vocational school (vo-tech) campus to Blue Mountain High School's gymnasium for 4th block basketball practice. Brown was also on the baseball team and planned to attend the high school baseball game immediately following basketball practice. On that particular day, the vo-tech bus ran late, and those boys on the bus arrived at the gym for practice later than usual. By the time Brown, Peterson, and the other vo-tech students arrived at the gym,[2] Coach Joseph Roberts[3] had already allowed the other eight members of the basketball team to enter the gym. Roberts had been in the locker room while those players changed clothes. Those eight students had all left the locker room and were in various locations on and around the basketball court for the beginning of practice at the time of the incident. It was undisputed that on a normal day, all fifteen members of the basketball team would arrive at the gym together, and Roberts would unlock the gym for all the students to enter at the same time. Roberts would then check and lock all the exterior doors leading

---

[2] According to Brown's deposition, there were seven members of the team on the vo-tech bus, including himself, who were in the locker room at the time of the incident.

[3] Joseph Roberts was a teacher, basketball coach, and the athletic director at Blue Mountain High School.

2

into the gym and escort the boys as a group to the locker room to change. It was also undisputed that Roberts' normal practice was to stay in the locker room with the boys while they changed; however, due to the late arrival of the vo-tech bus, he did not personally escort the second group of boys into the locker room on that day or stay in the locker room while they changed for practice. Instead, while Roberts was going through the procedure of checking and locking the exterior doors after the second group of boys arrived, the late-arriving boys proceeded to the locker room to get changed. It is further undisputed that while Roberts did not go to the locker room with the second group of boys, he never left the gym after they arrived. Brown headed directly to the locker room with the others; however, Peterson first stopped by Roberts' office, which was located near the front entrance to the gym.

¶3.    In his deposition, Brown testified that when he entered the locker room on the day in question, he began laying out his baseball uniform in preparation for the game later that night. Brown claimed that all of a sudden, the lights went off, and "that's just when it all started. . . ."[4]  According to Brown,

> the door slammed, and then the lights went off. . . . And when the door opened,
> I thought [John Dickerson[5]] had grabbed the door to open it. And so I got

---

[4] Incident reports and witness statements from the boys in the locker room on the day of the incident indicate that they were intending to play a prank on Peterson. The statements describe a scheme where Peterson would enter into the dark locker room and Brown would jump out and scare him. While these statements were used by both parties in the trial court proceedings and in their briefs on appeal, they were not in proper "summary judgment" form pursuant to Mississippi Rule of Civil Procedure 56(e).

[5] Dickerson was one of the other students present in the locker room at the time of the incident.

down off the locker. And when I s[aw] somebody standing at the door, I jumped backwards because it kind of scared me. And then all I see is this figure lunging forward at me attacking me.

While the lights in the locker room were turned off, Brown was stabbed with a knife. According to Brown, when the lights came on, he realized that Peterson had inflicted the injury and that he was bleeding badly. Brown testified in his deposition that he was unaware that Peterson had a knife in the gym that day, and to his knowledge the other students and Roberts were also unaware. Dickerson proceeded to help Brown to the school's main office, and as they were walking through the gym, they met Roberts walking out of his office near the front of the gym. Shortly after Brown made it to the main office, an ambulance arrived to assess his injuries. It was determined that Brown needed to be airlifted to a hospital in Tupelo. Once Brown arrived at the hospital, he first underwent an exploratory surgery to determine the extent of his injuries. Immediately thereafter, Brown was rushed into emergency surgery to repair damage to his rib cage and diaphragm. According to Brown, a tube was placed in his chest "[b]ecause there was so much blood and fluid building up around my lung from my spleen bleeding, and my diaphragm being cut that it was going to end up collapsing the lung if they didn't do something to get the pressure off of it." The surgery was successful, and Brown recovered from his injuries.

¶4. In his deposition, Roberts testified as to his recollection of the events that took place on May 6, 2020. According to Roberts, Brown and Peterson were the last students to enter the gym through the front double doors. Roberts then pulled the doors closed behind the boys. Roberts stated that he "spoke to them, greeted them, [and] sent them on their way."

4

Roberts testified in his deposition that the boys had been friends for years, and there was nothing unusual about their behavior that day. According to Roberts, after checking the other doors to the gym, he made his way back to the basketball court area, and that is when he saw Brown and Dickerson leaving the locker room after Brown had been injured. Roberts testified in his deposition that he was the only coach or faculty member in the gym at the time of the incident.

¶5.     On February 22, 2021, Aldridge sent her "Notice of Claim" to the school district pursuant to Mississippi Code Annotated section 11-46-11 (Rev. 2019). She subsequently filed a complaint on June 17, 2021. Aldridge's complaint alleged that the school district was liable for "failure to exercise reasonable care in protecting children, failure to implement sufficient childcare measures, failure to properly train employees, failure in selection of childcare protection, and failure to properly supervise the minors in its care." Following discovery, the school district moved for summary judgment. After a hearing on the school district's motion, the circuit court entered its "Order Granting Defendant's Motion for Summary Judgment" on February 27, 2023, ruling:

> Viewing the facts in a light most favorable to the Plaintiff, the Court finds that no genuine issue of material fact exists to show the Defendant failed to use ordinary care and take reasonable steps to minimize foreseeable risks to the Plaintiff thereby providing a safe school environment. *See Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 777 (Miss. 2016).

Aldridge filed her notice of appeal on March 15, 2023.

## STANDARD OF REVIEW

¶6.     In *White v. Targa Downstream LLC*, 358 So. 3d 627, 632 (¶11) (Miss. 2023), the

5

supreme court stated:

> "This Court employs a de novo standard of review when considering a trial court's grant or denial of summary judgment." *State ex rel. Watson v. Long Beach Harbor Resort, LLC*, 346 So. 3d 406, 409-10 (Miss. 2022) (internal quotation marks omitted) (quoting *Hobson v. Chase Home Fin., LLC*, 179 So. 3d 1026, 1033 (Miss. 2015)). Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c). "While evidence is viewed in the light most favorable to the nonmoving party, there must be a material fact issue to preclude summary judgment." *Peak v. Cohee*, 294 So. 3d 604, 607 (Miss. 2020) (citing *Leffler v. Sharp*, 891 So. 2d 152, 156 (Miss. 2004)).

## ANALYSIS

¶7. Aldridge argues that the circuit court erred in granting summary judgment. More specifically, she asserts that the school district "is not entitled to summary judgment because there are genuine issues of material fact as to whether or not the school district's conduct vis-a'-vis Coach Roberts constituted a failure to provide appropriate supervision of students in its care." Aldridge's argument relies on Mississippi Code Annotated section 37-9-69 (Rev. 2019), the school district's safety program policy, the Mississippi Educator Code of Ethics and Standards of Conduct, and Roberts' own usual procedure for supervising his classroom. Aldridge claims that pursuant to these authorities, Roberts had a duty to supervise the students in the gym locker room, and on May 6, 2020, he failed to do so, leaving the students to their own devices. According to Aldridge, because Roberts failed to supervise Brown and the other boys in the locker room, Peterson stabbed Brown, and as a result he sustained significant injuries.

¶8. The school district contends that Roberts did not fail to supervise Brown, Peterson,

6

or any of the other students in the high school gym on the day of the incident. In his deposition, Roberts described his classroom as "a little bigger than most"; in fact, it encompassed the entire gym. It is uncontradicted that Roberts never left the gym after the second group of students arrived for practice. Further, the school district argues that it had no notice of any potential danger, threat, or harm to any of the students on that day. Both Brown and Roberts stated in their depositions that they were unaware that Peterson had a knife in his possession. According to Roberts, the boys were good friends, and there was nothing unusual or out of the ordinary about the boys' behavior or their attitude toward one another on that day.

¶9.     Despite Aldridge's claim that Roberts had a duty to supervise his students at all times and more specifically in the locker room while they were changing into their basketball practice attire, the Mississippi Supreme Court held differently in *Chaffee ex rel. Latham v. Jackson Public School District*, 270 So. 3d 905, 909 (¶22) (Miss. 2019). In *Chaffee*, the supreme court stated, "[A]bsent special, dangerous circumstances, a school district does not have the duty of providing constant supervision of all movements of pupils at all times." *Id*. at (¶22) (citing *Levandoski v. Jackson Cty. Sch. Dist.*, 328 So. 2d 339, 341-42 (Miss. 1976)). The Court also held there were "no facts offered which indicate that their supervision was inadequate. Nor are there facts offered which suggest that this incident was reasonably foreseeable and preventable by taking of reasonable precautions." *Id*. at (¶21). Not only did *Chaffee* stand for the proposition that constant supervision is not always required, the court also held, "[W]e do not accept Chaffee's argument that adequate supervision can only be

7

measured against the adherence to or failure to adhere to bathroom-use ordinary practices."

*Id*. at 908 (¶17). Therefore, absent something more, failure to maintain constant supervision or failure to adhere to usual, ordinary practices is not inherently negligent.

¶10.    In *Simpson County School District v. Wigley ex rel. J.L.H.*, 356 So. 3d 147, 157 (¶28) (Miss. Ct. App. 2022), this Court reasoned:

> There must be a proximate causal connection between the inadequacy or lack of supervision and the accident. *Levandoski v. Jackson Cty. Sch. Dist.*, 328 So. 2d 339, 342 (Miss. 1976).

This Court also held:

> Liability only attaches when a school fails to utilize ordinary care to prevent foreseeable injury. . . . A plaintiff must show that the injury sustained . . . was a reasonably foreseeable consequence of the defendant's negligence. . . . Even if a party is negligent, he is not liable to the plaintiff unless the negligence is the proximate cause of the injury. . . . Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others.

*Wigley*, 356 So. 3d at 155 (¶¶21-23) (internal quotation marks omitted).

¶11.    This Court was presented with a similar set of facts in *Bumpous v. Tishomingo County School District*, No. 2022-CA-01010-COA, 2023 WL 7513727, at *4 (¶¶20-21) (Miss. Ct. App. Nov. 14, 2023). In *Bumpous* this Court reasoned:

> All the students were friends, so there was no indication that K.M. and D.C. intended to harm A.B. "Absent special, dangerous circumstances, a school district does not have the duty of providing constant supervision of all movements of pupils at all times." *Chaffee*, 270 So. 3d at 909 (¶22) (quoting *Levandoski v. Jackson Cnty. Sch. Dist.*, 328 So. 2d 339, 241-42 (Miss. 1976)). Even assuming that Cheaves did not see A.B. fall or that she had her back turned to talk to other students, this fact is not material to her actions' reasonableness under the circumstances.
>
> The dissent seems to project that this incident took place in a traditional school

setting like math or English class rather than a non-traditional show choir class. The dissent cites Mississippi Code Annotated section 37-9-69 (Rev. 2019), which charges teachers and school administrators to hold pupils "to strict account for disorderly conduct at school . . . ." Relying on this statute is misplaced because our caselaw tells us that the standard we should hold Cheaves and TCSD to is that of a reasonable person in the same or similar circumstances. *J.E.* [*v. Jackson Pub. Sch. Dist.*], 264 So. 3d [786,] 791 (¶13) [(Miss. Ct. App. 2018)].

*Id*. at (¶¶20-21).

¶12.    In the case at hand, although Roberts was not in the locker room with Brown and Peterson when the incident occurred, it is undisputed that he never left the gym. Much like the classroom in *Bumpous*, Roberts' classroom was a "non-traditional" classroom that encompassed the entire gym. Also, like the students in *Bumpous*, Brown and Peterson were friends, and nothing in the record shows that their teacher/coach had any indication or reason to believe that any altercation would occur between the students. Nothing in the record indicates that anyone, including Brown or Roberts, knew that Peterson had a knife. Just as this Court reasoned in *Bumpous*, even if Roberts did not see the incident take place, this fact is not material to his actions' reasonableness under the circumstances.

¶13.    In *Robertson v. Houston, Mississippi Public School District*, 335 So. 3d 1082, 1086 (¶14) (Miss. Ct. App. 2021), despite the school district having notice of a possible altercation between two students, this Court held:

> [W]e can find nothing to show that the School District either failed to provide A.R. with a safe school environment or failed to use ordinary care and take reasonable steps to minimize foreseeable risks to A.R. As discussed, a "school is not an insurer of the safety of pupils but has the duty of exercising ordinary care, of reasonable prudence, or of acting as a reasonable person would act under similar circumstances."

9

Further, this Court found no genuine issue of material fact precluding the circuit court's grant of summary judgment. *Id*. at (¶15). Unlike the case in *Robertson*, in the case at hand, the school district had absolutely no notice that Peterson had a knife on the day of the incident. Further the school district had no notice of any disagreement or brewing animosity between the boys. There is no evidence in the record that Roberts acted any differently than a reasonable person would act under similar circumstances.

¶14. Finally, while this Court recognizes that "the issue of proximate cause is generally an issue for a jury to decide, this fact does not change the requirement that to withstand a motion for summary judgment, the non-moving party must present evidence that would allow a jury to find that the breach proximately caused the injury at issue." *Rogers v. Barlow Eddy Jenkins P.A.*, 22 So. 3d 1219, 1225 (¶23) (Miss. Ct. App. 2009) (quoting *Davis v. Christian Brotherhood Homes of Jackson, Miss. Inc.*, 957 So. 2d 390, 410 (¶48) (Miss. Ct. App. 2007)). In the case at hand, Aldridge has presented no proof that Roberts had a duty to be present in the locker room while the boys were changing into their basketball practice attire. Roberts' failure to follow his usual practice does not establish a breach of his duty, especially in this unusual situation. *See Chaffee*, 270 So. 3d at 908 (¶17). Further, there is no proof that his breach, if any, was a proximate cause of Brown's injuries.

## CONCLUSION

¶15. After review of the record, we find no material fact issue to preclude summary judgment. Therefore, we find no error by the circuit court in granting the school district's motion for summary judgment.

¶16.   **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McDONALD, J., JOINS IN PART.**

**CARLTON, P.J., DISSENTING:**

¶17.   I find that Aldridge has met the requirement to survive summary judgment by showing that a genuine issue of material fact exists as to whether the School District breached its duty to use ordinary care and take reasonable steps to minimize foreseeable risks to Brown. I therefore respectfully dissent from the majority's decision affirming the circuit court's grant of summary judgment in favor of the School District.

¶18.   "To prove a negligent supervision claim, a plaintiff must establish by a preponderance of the evidence the existence of a duty of care, a breach of that duty, proximate causation, and compensable damages." *Simpson Cnty. Sch. Dist. v. Wigley ex rel. J.L.H.*, 356 So. 3d 147, 154-55 (¶21) (Miss. Ct. App. 2022). Mississippi Code Annotated section 37-9-69 (Rev. 2019) provides that public school teachers have a "duty . . . [to] hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess." The supreme court has stated that this duty imposes on public schools "the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 777 (¶17) (Miss. 2016). Additionally, the School District's Safety Program Policy sets forth specific guidelines for School District employees to follow

11

regarding reasonable steps in providing a safe school environment for students; namely, that students will be "adequately supervised."

¶19. This Court has held that to establish a breach of the duty to minimize foreseeable risks and provide a safe environment, "a plaintiff, even a child, has the burden of showing that school district employees did not perform the duties to which they were assigned." *Wigley*, 356 So. 3d at 155 (¶21). "Liability only attaches when a school fails to utilize ordinary care to prevent foreseeable injury." *Id*. at (¶22). "Moreover, 'there must also be a proximate causal connection between the inadequacy or lack of supervision and the accident.'" *Id*. (quoting *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc.*, 759 So. 2d 1203, 1212 (¶38) (Miss. 2000)). "A plaintiff must show that the injury sustained was a reasonably foreseeable consequence of the defendant's negligence." *Id*.

¶20. As argued by Aldridge, this case hinges on the issue of whether the students in the locker room were adequately supervised by Coach Roberts. It is undisputed that although Coach Roberts remained in the gym, he was not in the locker room at the time of Brown's injury. Aldridge argues that because Coach Roberts was not present in the locker room, which was a departure from his usual policy and practice, the students were not adequately supervised. The School District maintains that because Coach Roberts was inside his classroom, which encompassed the entire gym, during the time that the students were in the locker room, the students were adequately supervised. Accordingly, I find that a genuine issue of material fact exists as to whether Coach Roberts breached his duty to adequately supervise the students. Furthermore, the supreme court has held that "the adequacy of the

12

supervision . . . is an issue for jury determination." *Summers*, 759 So. 2d at 1214 (¶51); *see also Colyer v. First United Methodist Church of New Albany*, 214 So. 3d 1084, 1087 (¶12) (Miss. Ct. App. 2016).

¶21.   Additionally, I agree with Aldridge's assertion that "the risk of injury due to pranks, horseplay, and/or locker room antics" is a reasonably foreseeable consequence of Coach Roberts's failure to adequately supervise the locker room. *See Wigley*, 356 So. 3d at 155 (¶22).

¶22.   Because I find that a genuine issue of material fact exists as to whether the School District breached its duty, I would reverse the circuit court's grant of summary judgment and remand this matter for further proceedings consistent with this separate opinion.

**WESTBROOKS, J., JOINS THIS OPINION.  McDONALD, J., JOINS THIS OPINION IN PART.**